STATE of Iowa, Appellee,

v.

Edgar K. BAYLES, Appellant.

No. 94–2009.

Supreme Court of Iowa.

June 19, 1996.

Linda Del Gallo, State Appellate Defender, and Kevin Cmelik, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, John P. Sarcone, County Attorney, and Melodee Hanes, Assistant County Attorney, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, NEUMAN, and ANDREASEN, JJ.

LAVORATO, Justice.

Edgar Karrol Bayles appeals from a judgment of conviction and sentence for kidnapping in the first degree. *See* Iowa Code §§ 710.1(3), 710.2 (1993). He raises three issues. First, he contends the district court abused its discretion by admitting character evidence concerning other crimes, which he claims was irrelevant and unfairly prejudicial. Second, he contends the evidence was insufficient to establish his guilt on the charge. Last, he contends his trial counsel were ineffective because they failed to object to alleged instances of prosecutorial misconduct. We affirm.

### I. *Background Facts.*

Viewing the evidence in the light most favorable to the State, we think the jury could find the following facts. Bayles met J.W. in 1976 when he was thirty and she was fifteen. They moved to Colorado where J.W.

had Bayles' son, whom they named Carlos. She was sixteen at the time.

Over time, Bayles increasingly exerted control over J.W. During the relationship J.W. endured Bayles' physical and mental abuse. Things became even worse after Carlos' birth. J.W. eventually left Bayles and returned to Des Moines with Carlos.

Bayles followed her back to Des Moines. Bayles then left for Arizona. While there, he was arrested for the kidnapping and repeated rape of a fifteen-year-old girl. He was convicted on several charges and served a fifteen-year sentence. J.W. initially corresponded with Bayles. She never went to see him and eventually severed all ties. Bayles was paroled in February 1993.

J.W.'s next contact with Bayles occurred on August 21, 1993, when he appeared unannounced at her Des Moines home. She testified that she was stunned to see Bayles. He told her he was back in town, and wanted to discuss Carlos' future with her. At the time Carlos was residing in the Polk County Youth Shelter because of juvenile problems.

Bayles moved into J.W.'s home early in September. The couple reestablished their intimate relationship, but the situation soon began to deteriorate. Bayles again became controlling and abusive. J.W. told him to go back to his wife in Indiana, or get a job and find a place of his own. She told friends and coworkers that she was concerned Bayles would harm her.

Despite J.W.'s repeated requests, Bayles refused to leave her home. On October 10, J.W. left out of fear. She stayed overnight with a friend, returning the next day to retrieve some clothing. A neighbor accompanied her inside. They saw Bayles talking on the telephone. J.W. refused to take the phone from Bayles because she was afraid to get too close to him.

Again J.W. asked Bayles to leave and he refused. She went to a neighbor's house and called the police. Bayles finally left J.W.'s home after talking with the responding officer. When Bayles left, his car was packed with his belongings. J.W. told Bayles she did not want him around anymore. To J.W.'s knowledge, Bayles had no keys to enter her home.

J.W. told neighbors that if they ever saw Bayles' car at her house, they should notify the police. She told friends and coworkers that she was afraid Bayles was going to kill her.

On the night of October 11, J.W. stayed with a friend. She was afraid Bayles would come back to her home. She did not go to work the following day because she was afraid Bayles knew where she worked.

On the night of October 12, J.W. again stayed with a friend. She finally returned to work the following day. On that day, Bayles unexpectedly appeared at a convenience store where J.W. was taking a work break with coworkers. He came up behind her and spoke to her. She turned around and saw it was Bayles; she noticed he had shaved his head. She was scared and left the store without talking to him.

That evening J.W. stayed with a friend. She worked the next day, Thursday, October 14. After work, she returned home. Because she was afraid, she asked a friend to spend the night there. He gave her a gun for protection, loaded the chamber with a live round, and told her just to point it and pull the trigger if she had to defend herself. During the evening Bayles called her; she told him she did not want to talk to him and that she was afraid of him.

The next day—Friday, October 15—J.W. went to work. She saw a car that looked like Bayles' pass by where she was parked. That evening she spent the night at a motel in Indianola. She chose to go to the motel instead of going to friends because she was afraid Bayles would find her.

The following day, J.W. had her brother change the locks on the doors in her home. Her son could not find his house key so she feared Bayles had taken it. She told her brother she wanted the locks changed because she was afraid of Bayles and was afraid to be in the house alone. For the first time in a week, J.W. spent the night in her own home.

The next day, Sunday, J.W. visited her son and attended to some personal matters. Be-

fore leaving home that morning, she put a roast in the crock pot because she had invited her brother for supper. She returned home about 6:30 in the evening, checked the roast, and put the loaded gun she had been carrying on the vanity next to her bed.

She then went to the basement door to let her dog out. As she approached the door, Bayles grabbed her from behind. He held a knife to her throat, saying "Shut up or I'll dust you right now." The knife he was using was one that he carried all the time. He taped her mouth and wrists with duct tape, threw her purse and a coat over her arms, and led her to her car.

Bayles drove J.W.'s car to a nearby hospital parking lot where he had left his car. He transferred J.W. to his car. At this point he taped J.W.'s legs together with the duct tape. He drove east on Interstate 80.

On this drive, Bayles repeatedly threatened to kill J.W. Specifically, he (1) asked her whether she would like to swim in the Dubuque River, (2) warned her his car could do over 100 miles per hour and that anyone thrown out at that speed would be killed, and (3) told her he had shaved his head so that when her body was discovered there would be no hair evidence to connect him to her.

Bayles stopped the car at a Newton motel. He left J.W. bound in the car, and went inside to register. When he returned, he removed the duct tape from J.W.'s legs and took her into the motel room.

J.W. was shivering, so she asked Bayles if she could get under the covers. He let her do so but only after insisting she take off all of her clothes. Then he told her she was lucky he was only going to have sex with her because what he really ought to do is drown her in the tub.

Ultimately, J.W. and Bayles twice engaged in intercourse after he threatened to drown her in the bathtub. At all times the knife Bayles carried was on a bedside table within his reach. J.W. did not want to have sex with him but did so—in her words—"to survive." She decided on this course of action because of the violent things Bayles told her he had done in the past. She also thought

that if she would be nice to him and tell him what he wanted to hear, he might let her live.

After the sex, Bayles talked about getting back together and getting married. J.W. readily agreed, knowing that if she continued to say things he wanted to hear, she could come out of the ordeal alive.

At the motel, the pair—at Bayles' suggestion—called her brother and Bayles' half-sister, Mary. J.W. apologized to her brother about missing dinner and only said "Hi" to Mary, whom she knew.

The next day Bayles took J.W. to a McDonalds for breakfast and stopped at a convenience store for some items. At all times he was in close proximity to J.W. or was actually touching her.

Bayles eventually drove J.W. back to Mary's home. When he left the room, J.W. told Mary what had happened. J.W. told Mary not to call the police, because she feared Bayles might try to harm Mary and her two small children.

Bayles then took J.W. back to her home, where the two again had intercourse. Before this she was able to retrieve the gun she had laid on her vanity table the Sunday before. She hid the gun because she was afraid to use it. By this time Mary and J.W.'s neighbor had called the police.

When the police arrived at J.W.'s home they saw J.W. at the door, with Bayles at her side. J.W. told the officers she was fine before they were able to ask her any questions. The officers then took J.W. to their squad car, where she broke down and related what had happened. The officers arrested Bayles.

II. *Background Proceedings.*

The State charged Bayles in a two-count trial information. Count I was for first-degree kidnapping, a class "A" felony. *See* Iowa Code §§ 710.1(3), 710.2. Count II was for first-degree burglary, a class "B" felony. *See* Iowa Code §§ 713.1, 713.3. The jury convicted Bayles on both counts. The court sentenced Bayles to life in prison without the possibility of parole on the kidnapping conviction. On the burglary conviction, the

court sentenced Bayles to a term not to exceed twenty-five years.

Bayles does not challenge the conviction for first-degree burglary. He appeals from the judgment of conviction and sentence on the kidnapping count.

### III. *Admission of Other–Crimes Evidence.*

Iowa Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Under the rule, character evidence may be admitted for several other purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

We have said the list of exceptions enumerated in rule 404(b) is not exclusive. *State v. Plaster,* 424 N.W.2d 226, 228 (Iowa 1988). We have also said that

> [t]he key is whether the challenged evidence is relevant and material to some legitimate issue other than a general propensity to commit wrongful acts. If the evidence meets this litmus test, it is prima facie admissible, notwithstanding its tendency to demonstrate the accused's bad character.

*Id.* at 229 (citation omitted).

Bayles claims the district court abused its discretion when, contrary to pretrial rulings on Bayles' motions in limine, it admitted evidence of Bayles' other crimes. The district court admitted Bayles' statements to J.W. that he allegedly had (1) raped his own sister when the two were children, (2) served fifteen years in prison for the crimes of rape and kidnapping, (3) killed three men while in prison, and (4) committed an assault on a woman shortly after his release from prison.

Bayles argues this evidence should have been excluded under rule 404(b) because (1) it was not relevant, (2) it was admitted without adequate foundation, and (3) if it was relevant, its prejudicial impact outweighed its probative value. Bayles' arguments call into play our *Plaster* framework of analysis for

determining whether evidence of other crimes is admissible.

The analysis is a two-step process. The district court must first determine whether the evidence of other crimes is relevant. If it finds that such evidence is relevant, the court must then decide whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice. If the court makes a positive finding on the second step, this finding overcomes the evidence's prima facie admissibility. *Plaster,* 424 N.W.2d at 229 (citation omitted).

In employing this two-step analysis, the district court must exercise its discretion. In reviewing the court's ruling, we reverse only if we find a clear abuse of discretion. *Id.* We find the district court has abused its discretion only when the district court has exercised its discretion on grounds or for reasons clearly untenable, or to an extent clearly unreasonable. *State v. Knox,* 536 N.W.2d 735, 738 (Iowa 1995) (citation omitted).

We take each of Bayles' abuse of discretion arguments in turn.

A. *Relevance.* Bayles contends none of the other crimes were relevant to the charge. He argues he used none of these acts as a threat to directly coerce J.W.'s consent to intercourse. Bayles vigorously asserts that admission of this other-crimes evidence unfairly prejudiced the jury by allowing them to (1) conclude he was a bad person, and (2) convict him solely on that basis.

The State counters the district court did not abuse its discretion when it admitted evidence of Bayles' other crimes. In keeping with the court's pretrial motion in limine rulings, the State argues it did not offer this evidence to prove Bayles was a bad person. Rather the State offered the evidence and the court received it for the limited purpose of proving J.W.'s state of mind at the time of the alleged kidnapping and sexual intercourse. The State points out J.W. testified that (1) she had learned this information from Bayles, (2) because of this information she was fearful of him, and (3) this information played a significant part in her decision

not to resist the alleged kidnapping or alleged sexual abuse.

Iowa Rule of Evidence 401 provides that evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." According to one commentator, the test is "whether a reasonable person might believe the probability of the truth of the consequential fact to be different if that person knew of the proffered evidence." 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 401[07], at 401–49 to 401–50 (1994) (footnote omitted).

The consequential fact here is whether J.W. consented to the sexual intercourse during Bayles' alleged kidnapping of her. Is the likelihood that Bayles did not have J.W.'s consent enhanced by her knowledge of these other crimes? We think it is and for that reason we believe the contested evidence was relevant to Bayles' claim of consent. *See Plaster*, 424 N.W.2d at 229–31 (other-crime evidence is relevant to rebut a consent defense to sexual abuse).

In a case involving similar facts, one court explained why other-crime evidence is highly relevant to rebut a claim of consent:

The testimony of the complaining witness concerning the prior crimes which, to her knowledge, appellant had committed, credibly explained and placed in context many of her statements to and actions toward him. Her fear of the appellant was in part due to his past history of attacks on women. The complaining witness made every effort to remain calm and to refrain from screaming because of her training as a psychiatric social worker. In her judgment she had a better chance of avoiding serious bodily injury if she remained calm. She feared that he would "cut her up" if she "tried to fight him."

It was important that the jury know all of the facts involved so that they would not mistakenly construe the complaining witness's calm manner and lack of screaming as indicative of consent or lack of forcible compulsion.

*State v. Iaukea,* 56 Haw. 343, 537 P.2d 724, 731 (1975).

Similarly, here, J.W.'s testimony concerning Bayles' other crimes, which he had related to her, credibly explained and placed in context many of her statements and actions toward Bayles during the alleged kidnapping. Her fear of Bayles stemmed in part from her knowledge of these crimes. In her judgment she had a better chance of surviving if she had sex with him, was nice to him, told him what he wanted to hear, and passed up opportunities to escape. Along these lines she testified as follows:

Q. [J.W.] did you want to have sex with [Bayles]? A. No.

Q. Why did you? A. To survive.

Q. What made you agree to have sex with him at that point? What were the things that you were thinking? A. That I wouldn't survive if I didn't.

Q. Was there anything that he had told you that caused you to have sex with him at that point? Was there anything that you knew about him? A. I knew he had told me he had killed these three people in prison. And I knew that he had been violent in the past. And when he told me how lucky I was that he didn't take me in the bathroom and drown me, I agreed with him.

. . . .

Q. [J.W.], what things about his past influenced your decision to go ahead and have sex with him that night? What things about his past that he had told you influenced that decision? ... A. Well, Shawna Hodges had survived.

Q. And who was Shawna Hodges? A. She was the girl that he had raped and kidnapped in Arizona. She was the one he went to prison for. And she survived.

Q. What other things that he had told you about his past, [J.W.], affected your decision? A. And the fact that he killed three people in prison.

As the court explained in *Iaukea*, it was important that the jury know all of the facts involved so they would not misconstrue J.W.'s submission and agreeable manner as indicative of consent or lack of forcible com-

pulsion. Relying on a similar theory, we recently held in a sexual abuse case that the district court did not abuse its discretion in admitting evidence of the defendant's statement to the victim about killing a woman who did not cooperate. We determined the statement was relevant to rebut the defendant's claim that the victim consented and to show that she passed up opportunities to escape because she feared for her life. *State v. Tillman*, 514 N.W.2d 105, 108–09 (Iowa 1994).

B. *Lack of foundation.* Bayles also argues evidence of his other crimes is hearsay. He asserts that an adequate foundation must be laid before hearsay statements are admissible. He complains that, contrary to the court's ruling on his motions in limine, the court admitted hearsay evidence without any foundation.

The State replies that Bayles, himself, provided evidence of his other crimes to J.W. These statements, the State argues, are admissions against interest. Admissions of a party opponent, the State concludes, are not hearsay statements and do not need corroboration before admission.

Iowa Rule of Evidence 801(d)(2) provides that a statement is not hearsay if "[t]he statement is offered against a party and is ... his own statement." *See also State v. Kidd,* 239 N.W.2d 860, 864 (Iowa 1976) (reiterating that Iowa follows federal interpretation of rule 801 excluding admissions from the definition of hearsay). In addition,

> [p]arty-opponent admissions are admissible whether or not the opponent testifies. They constitute substantive evidence of the facts asserted but are not conclusive evidence of those facts....

There is no requirement that the party-opponent testify prior to introduction of an admission because the party-opponent usually will have an opportunity to testify to explain the admission or deny the statement. The party-opponent cannot seek exclusion of the admission because of lack of reliability of the admission, if made, based on observation defects, failure of memory or lack of opportunity by the party-opponent to cross-examine himself or his representatives when the admission was made. Such an assertion by the party-opponent would be meaningless since the party-opponent would be suggesting that he is untruthful when not under oath and needs to be cross-examined to be accurate.

7 James A. Adams & Kasey W. Kincaid, *Iowa Practice* § 801.9, at 401 (1988) (discussing Iowa Rule of Evidence 801(d)(2)). *See also* Iowa R.Evid. 613(b) ("Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. *This provision does not apply to admissions of a party-opponent as defined in Iowa R.Evid. 801 "d"(2).")* (emphasis added); *McCormick's Handbook of the Law of Evidence* § 262, at 629–30 (Edward W. Cleary ed., 2d ed. 1972) ("[A]dmissions of a party come in as substantive evidence of the facts admitted, and ... no foundation or predicate, by examining the party himself, such as may be required for impeaching evidence, is prerequisite for proof of admissions."); *State v. Hephner,* 161 N.W.2d 714, 720 (Iowa 1968) (holding—prior to adoption of Iowa Rule of Evidence 801(d)(2)—that no foundation is needed for admissions of party-opponent).

J.W. testified that she learned of Bayles' other crimes from Bayles. As the foregoing authorities suggest, these statements are (1) admissions of a party-opponent, (2) not hearsay, and (3) admissible on the strength of J.W.'s testimony alone.

C. *Probative value versus unfairly prejudicial impact.* Bayles argues that even if we find the contested evidence was relevant, nevertheless the evidence was far more prejudicial than probative upon any fact in issue. He characterizes the unfairly prejudicial effect of the contested evidence this way: "One can hardly imagine acts which prey on people's fear more than recidivism and the revolving doors of the prisons. The State was able to paint the defendant as a career criminal dating to his adolescence whom the justice system had failed to tame."

As mentioned, if the district court determines other-crime evidence is relevant, it must then decide whether its probative value is substantially outweighed by the danger of unfair prejudice. Iowa R.Evid. 403. This is the second step of the two-step analysis in determining whether other-crime evidence is admissible. *Plaster,* 424 N.W.2d at 229.

We mentioned earlier that "relevancy" is the tendency to make the existence of a consequential fact more or less probable. *Id.* "Probative value" gauges the strength and force of that tendency. *Id.* at 231 (citation omitted). We defined "unfair prejudice" in rule 403 as "an undue tendency to suggest decisions on an improper basis, commonly though not necessarily, an emotional one." *Id.* (citation omitted).

■ Rule 403 does not make inadmissible all prejudicial evidence; it only prohibits evidence that is *unfairly* prejudicial. *Id.* Examples of unfairly prejudicial evidence includes evidence that

appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action. . . .

*Id.* (citation omitted). Such evidence may cause a jury to base its decision on something other than established facts. Evidence of this sort may convince an appellate court that "unfair prejudice" occurred because the theory upon which this evidence was offered was designed to elicit a response from the jurors not justified by the evidence. *See, e.g., State v. Liggins,* 524 N.W.2d 181, 188–89 (Iowa 1994) (evidence of defendant's delivery and distribution of cocaine, *having nothing to do with the crime charged,* held to be inherently prejudicial because it appealed to the jury's instinct to punish drug dealers).

■ In the balancing process under rule 403, we

balance[ ], on the one side, the actual need for the other-crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility.

*Plaster,* 424 N.W.2d at 232 (citation omitted).

■ J.W.'s testimony concerning Bayles' other crimes was critical to the prosecution's case. As we mentioned, this testimony credibly explained and placed in context many of her statements and actions toward Bayles during the alleged kidnapping. From her testimony, we learn her fear of Bayles stemmed in part from her knowledge of these crimes. We also learn from her testimony that she firmly believed she had a better chance to survive by having sex with Bayles, by being nice to him, by telling him what he wanted to hear, and by passing up opportunities to escape. Without the other-crime evidence to explain J.W.'s actions, there was a good chance the jury would mistakenly believe she was not kidnapped and that she thereafter consented to sexual intercourse with Bayles. This was especially likely in light of her consensual intercourse with him in the weeks before the alleged kidnapping.

In his direct testimony, Bayles testified about his fifteen-year incarceration in Arizona. He admitted sexually assaulting his sister, but insisted his father forced him to do so. He disputed killing three men in prison, claiming he had told J.W. that he had witnessed the killing of three men in prison. So his own biased testimony corroborates to some extent J.W.'s testimony.

Admittedly, some of the other-crime evidence was remote in time. But because the other-crime evidence was highly probative as to J.W.'s actions during the alleged kidnapping, the temporal remoteness in and of itself does not defeat admission of such evidence. *See State v. Spargo,* 364 N.W.2d 203, 209 (Iowa 1985) (prior acts evidence that is highly probative may be admitted even though the acts to which it pertains are remote in time).

Undoubtedly, the other-crime evidence was prejudicial to Bayles' case. But the question is, was it *unfairly* prejudicial? The district court was in the best position to tell whether the jury would convict solely be-

cause of it. In making that judgment call, the district court had considerable discretion. Given the attendant circumstances that appear in this record, we cannot say the district court abused its discretion when it concluded the evidence was not unfairly prejudicial and admitted it.

In *Plaster*, the district court gave a cautionary instruction explaining the purpose of the challenged evidence and admonishing the jury that it must not convict the defendant merely because he committed other crimes in the past. *See Plaster*, 424 N.W.2d at 232. We note that the district court here gave no such instruction. Although here the district court's failure to give such an instruction does not change the result, we think the better practice calls for such an instruction in similar circumstances. Such an instruction would help to nullify the danger of unfair prejudice.

IV. *Sufficiency of the Evidence to Establish Kidnapping in the First Degree.*

■ The elements of first-degree kidnapping as submitted to the jury were:

1. Bayles had confined or removed J.W. from her home;

2. Bayles had done so with a specific intent to either inflict serious injury upon her, or to subject her to sexual abuse;

3. The removal or confinement was done without the consent or authority of the victim; and

4. As a result of the confinement or removal, the victim was intentionally subjected to sexual abuse.

Bayles contends that when the evidence presented on the kidnapping charge is viewed in a light most favorable to the State, as a matter of law it was insufficient to support a verdict. Specifically, he contends the evidence was insufficient as to the intentional sexual abuse element of the charge. Bayles insists the State must prove he intentionally performed a sex act against the will of J.W. Bayles believes the evidence is unequivocal that J.W. "actively encouraged the sexual intercourse, such that [Bayles] could have no belief that the acts of sexual inter-

course were not consensual in nature." Bayles concedes there is sufficient evidence to convince a jury that he used force or threats to secure J.W.'s presence. But, he argues, he did not use force or threats to coerce her into having intercourse. Under the circumstances, he says he "had no reason to believe that the sexual relations were anything but consensual."

The State counters there is overwhelming evidence that J.W. did not consent to the multiple sex acts that occurred during the alleged kidnapping.

Our review of a substantial evidence claim is on error. Iowa R.App.P. 4. We are bound by the jury verdict unless the verdict is not supported by substantial evidence. *State v. Lewis*, 514 N.W.2d 63, 65–66 (Iowa 1994). In making this determination, we must consider all the evidence in the light most favorable to the State. *State v. Robinson*, 288 N.W.2d 337, 340 (Iowa 1980). We accept all legitimate inferences that may fairly and reasonably be deducted from the evidence. *State v. Schrier*, 300 N.W.2d 305, 306 (Iowa 1981) (citations omitted). Evidence is substantial if it could convince a rational fact finder that the defendant is guilty beyond a reasonable doubt. *State v. Taft*, 506 N.W.2d 757, 762 (Iowa 1993) (citation omitted). Direct and circumstantial evidence are equally probative. Iowa R.App.P. 14(f)(16). Evidence, whether direct or circumstantial, must however do more than create speculation, suspicion or conjecture. *Schrier*, 300 N.W.2d at 308.

We assume, without deciding, that the State must prove Bayles intentionally performed a sex act against the will of J.W. during the alleged kidnapping. On this issue we have the following testimony from J.W. about what happened once the two were in the Newton motel:

Q. When you went in, describe the room, if you could. A. There were two beds and a table and a TV, some drawers, and then off to the side was a bathroom. And there was a vanity outside the bathroom.

Q. What happened once you got into the room? A. He took the knife and he cut the duct tape off my wrists.

Q. Where did he put that duct tape that was on your wrists? A. Originally he laid it on the table next to the bed.

Q. Tell us what happened next, [J.W.]. A. I was shivering, so I asked him if I could get under the covers.

Q. What did he say? A. And he said "I don't think I should let you get under the covers, because you made me sleep out in the cold, and it was cold out, so why should I let you be warm?"

Q. Go on. A. Then he let me get under the covers, but I had to take my clothes off.

Q. Who said you had to take your clothes off? A. Ed did.

Q. Did you do that? A. Yes, I did.

Q. Tell us what happened. A. Then I took off my clothes and I got underneath the covers.

Q. How close in proximity is he to you at this time? A. I'm in the bed, and he's standing beside the bed.

Q. Where's the knife? A. He still has the knife.

Q. In his hand? A. He still has the knife.

Q. What happened next? A. Then he told me that I was lucky, that all he was going to do was fuck me, because what he really ought to do is take me into the bathroom and drown me in the tub.

Q. What happened after he said that? A. He took off his clothes and got into bed with me.

Q. Where was the knife? A. The knife was on the table beside the bed.

Q. Was it within his reach? A. Yes, it was.

Q. What did he do next? A. We had sex.

. . . .

Q. [J.W.], did you want to have sex with him? A. No.

Q. Why did you? A. To survive.

From this testimony, we think a jury could reasonably infer that Bayles intended to have sex with J.W. whether she wanted to or not. His actions, statements, and threatening manner supporting this inference all took place *before* J.W. could by word or action indicate what her response might be.

More important, even though J.W. submitted without protest, Bayles had no basis—reasonable or otherwise—to think that she had in fact consented to sexual intercourse during her confinement. We reach this conclusion because of the overwhelming evidence of his repeated threats to harm J.W., his history of violence and sexual abuse, and the way he abducted J.W.—threatening her with a knife and binding her.

The following incident further supports our conclusion. During the ride to Newton, Bayles told J.W. he had shaved his head so that when her body was discovered, there would be no hair evidence connecting him to her. Shaving his head and his reason for doing so could reasonably lead a jury to find that Bayles had planned to (1) abduct J.W., (2) have close intimate contact with her—probably forcible sexual intercourse, and (3) kill her. He had in the past been discovered, apprehended, and imprisoned for committing sexual abuse. This time he would make sure that the same thing would not happen.

### V. *Ineffective Assistance of Counsel.*

Bayles contends his trial counsel were ineffective because counsel failed to object to instances of what he alleges was prosecutorial misconduct. Bayles thinks the prosecutor engaged in improper methods to obtain Bayles' conviction by "forcing" Bayles, on cross-examination, to "comment[ ] on the veracity of other witnesses to the proceeding." He points to the line of questions the prosecutor asked Bayles regarding J.W.'s truthfulness and also the truthfulness of the five officers who responded to Mary's and the neighbor's calls for help.

Bayles thinks this line of questioning placed him in an untenable position, forcing him to comment on the veracity of J.W. and other witnesses to his prejudice. He argues the prosecutor's questioning invades the province of the jury, whose function is to determine the credibility of the witnesses.

The State replies that this claim should be preserved for postconviction relief because the record is inadequate for us to reach the

merits. In the alternative, the State argues Bayles failed to show his trial counsel breached an essential duty to his prejudice.

Because Bayles alleges a violation of his Sixth Amendment right to counsel, our scope of review is de novo based on the totality of the circumstances. *Taylor v. State,* 352 N.W.2d 683, 684 (Iowa 1984).

█ Generally, we preserve claims for ineffective assistance of counsel for postconviction relief determination. *See State v. McCurry,* 544 N.W.2d 444, 448 (Iowa 1996). If the record on appeal is sufficient to determine the issue, we may decide the issue on appeal. *Id.*

█ We think the record here is sufficient to reach the merits. We will conclude trial counsel was ineffective only when a defendant can prove (1) counsel breached an essential duty, and (2) that breach was prejudicial to the defendant. *Id.* As to the second prong, Bayles must show a reasonable probability that, but for counsels' failure to object to the allegedly improper questions and answers, the outcome of the trial would have been different. *Taylor,* 352 N.W.2d at 685. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* (citation omitted). For the following reasons, we conclude Bayles' trial counsel was not ineffective.

Courts are split on the question whether a prosecutor may ask a defendant to comment on the veracity of other witnesses. *Compare State v. Emmett,* 839 P.2d 781, 787 (Utah 1992) (prosecution should not ask defendant to comment on veracity of other witnesses) *with Little v. State,* 194 Ga.App. 361, 390 S.E.2d 445, 446 (1990) (no error where prosecutor asked defendant whether contradictory witnesses were lying). However, for reasons that follow, we need not answer that question here. We assume, without deciding, that the prosecutor's line of questioning was improper.

█ However, before our decision in this case, there was nothing in our statutes, rules, or case law imposing a duty on defense counsel to object to the cross-examination questions at issue here. A claim for ineffective assistance of counsel will not lie when the law governing the issue complained of is unsettled at the time the cause is tried. *See, e.g., State v. Hepperle,* 530 N.W.2d 735, 740 (Iowa 1995) (ineffective assistance of counsel claims will not lie when state of the law on a particular issue is uncertain or unresolved).

Even if defense counsel had been under the duty to object to the prosecutor's line of questioning, no prejudice resulted from the jury hearing Bayles' answers to the contested questions. The evidence of Bayles' guilt on the kidnapping charge was overwhelming. The record—absent Bayles' statements that J.W. and the officers were lying—would have reasonably permitted the jury to reach the conclusion it did.

## VI. *Disposition.*

We reach the following conclusions. First, the district court did not abuse its discretion by admitting character evidence of Bayles' other crimes. This evidence was not admitted to prove that Bayles was a bad person. It was admitted for the limited purpose of showing J.W.'s state of mind.

Second, there was substantial evidence to support the jury's finding that Bayles intentionally committed sexual abuse during the alleged kidnapping.

Last, Bayles' trial counsel were not ineffective. Defense counsel were under no duty to object to the prosecutor's line of questioning on the truth or veracity of other witnesses. And had Bayles' counsel been under such a duty, Bayles was not prejudiced by defense counsels' failure to object to the prosecutor's line of questioning.

We affirm Bayles' judgment of conviction and sentence for first-degree kidnapping.

AFFIRMED.