# IN THE COURT OF APPEALS OF IOWA

No. 14-1478
Filed February 10, 2016

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**MIRANDA PETITHORY-METCALF,**
    Defendant-Appellant.
_____


Appeal from the Iowa District Court for Polk County, Karen A. Romano, Judge.


Miranda Petithory-Metcalf appeals her conviction, following a jury trial, for murder in the second degree. **AFFIRMED.**


Mark C. Smith, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.


Heard by Danilson, C.J., and Vogel and Potterfield, JJ.

**PER CURIAM.**

Miranda Petithory-Metcalf (Petithory) appeals her conviction, following a jury trial, for murder in the second degree. She first asserts sufficient evidence does not support the jury's finding she acted with malice aforethought, and therefore, the district court erred when it denied her motion for judgment of acquittal. She also argues the court abused its discretion when it denied her motion in limine requesting she be allowed to cross-examine a witness about the matter of his U-Visa. Furthermore, she asserts trial counsel was ineffective for failing to file a motion for new trial asserting the verdict was against the weight of the evidence. In her final argument, she claims trial counsel was ineffective for withdrawing her motion to suppress, which had already been granted by the district court, thus allowing in evidence of her statements to police prior to being read her *Miranda* warnings.

We conclude that, with the consistent testimony of the witnesses establishing Petithory was the aggressor while arguing with the victim just prior to the stabbing, sufficient evidence supports her conviction for murder in the second degree. Additionally, the district court did not abuse its discretion when it ruled evidence of one of the witness's U-Visa application was inadmissible for lack of relevance. Particularly given our conclusion sufficient evidence supports the guilty verdict, trial counsel was not ineffective for failing to move for a new trial challenging the weight of the evidence. Finally, we preserve for possible postconviction-relief proceedings Petithory's claim trial counsel was ineffective for withdrawing the already-granted motion to suppress. Consequently, we affirm her conviction for murder in the second degree.

## I. Factual and Procedural Background

At trial, the jury could have found the following facts. On November 28, 2013, Petithory and several friends were drinking together in an apartment, after which the group decided to go to a bar. The first group with whom Petithory was drinking included Melvin Benitez (Melvin); his twenty-one-year-old mentally disabled brother, Salvador Benitez (Salvador); their cousin, Luis Ramirez; and Petithory's friend, Megan Weaver. At the bar, the group met up with Juan Carlos Garcia-Chavarria (Chavarria), Fermin Cerbellon, and Irvan Alfaro-Hernandez (Alfaro). Shortly before the bar closed, the group decided to go to Alfaro's apartment. On the way, the group in Petithory's car dropped Weaver off at her residence.

Chavarria had moved into Alfaro's apartment that day, and he was not very well known by most of the people in the group. Once everyone arrived at the apartment, they continued to drink beer. Because the apartment was not furnished, they stood around the kitchen listening to music. At some point in the night, Cerbellon requested to leave. Petithory offered to drive him in her car, but she could not locate her keys. Melvin stated they could use his car; so he, Petithory, and Cerbellon left.

While Petithory and Melvin were gone, the following incidents took place. Chavarria wanted to go somewhere but because Melvin's car was gone he could not do so, and he became angry. He demanded that Ramirez and Salvador leave the apartment, which they did, but they stayed in the building. They called Melvin to pick them up. While the two were out of the apartment, Alfaro lay down on the floor and fell asleep. When he woke up, he saw broken beer bottles and

glass throughout the apartment. Alfaro asked Chavarria what had happened, and Chavarria "started to go crazy," slapping Alfaro twice in the face. After their altercation, Alfaro told Chavarria to leave the apartment, so Chavarria took his suitcase and left.

After he exited the apartment building, Chavarria tried to get back in, but the security door had locked behind him. Ramirez let him back into the building, and Chavarria apologized for demanding that Ramirez and Salvador leave, and invited them back in. The three men went back to the apartment. Chavarria knocked on the door, apologizing for his behavior, and Alfaro allowed everyone to come back into the apartment. Chavarria then went into the bedroom to lie down.

Petithory and Melvin returned to the apartment to pick up Ramirez and Salvador. They saw the shards of glass scattered around the floor and asked who had broken the beer bottles. Alfaro stated Chavarria was drunk, crazy, and had broken the bottles.[1] Melvin told Salvador they were leaving. Petithory stated she could not find her keys and went into the bedroom. Melvin testified she was angry because of the broken bottles, was "very, very loud, [s]tart[ed] cussing," and went into the bedroom to tell Chavarria to clean the apartment, though Petithory stated she went into the bedroom to look for her keys. With regard to the events that took place in the bedroom, all witnesses acknowledged they heard yelling and a loud thump, which sounded like someone slamming against

---

[1] Alfaro testified that when Petithory and Melvin came back to the apartment and saw the broken bottles, Petithory "was like oh, let me talk to him . . . ." With regard to her demeanor, Alfaro stated: "I think she came mad because before we hang out, we never do that. I mean, we just have fun, and I think she got surprised when she see all the mess in my house . . . . [She had a] normal voice."

the wall. Alfaro surmised that Chavarria had shoved Petithory into a wall; Petithory testified Chavarria pushed her, she pushed him back, and he pushed her a final time into the wall.

The witnesses to the stabbing included Melvin, Salvador,[2] Alfaro, and Ramirez. At trial, they testified in the following manner. Melvin asserted Chavarria backed out of the bedroom with Petithory following him down the hallway, yelling at him to clean up and swearing at him. He stated Chavarria, in Spanish, responded she was crazy, and he was not going to clean up the mess. He was also swearing at her, which made Petithory angrier. Chavarria stated "[t]his b*tch is crazy. Get her . . . the f**k off of me." Melvin then heard Petithory say, "[Y]ou don't know what I'm capable of. You don't know me. You don't know what I can do."[3] He then saw she had a knife in her hands, so he went over to Petithory and told her "you need to calm down, you got your kid." Thinking the altercation was over, Melvin turned around, and when he looked back, Chavarria had been stabbed.

---

[2] Salvador did not testify at trial.

[3] His testimony at trial was not entirely consistent with his deposition testimony, as illustrated by the following exchange:

> Q: And then you claim that Miranda said, you don't know what I'm capable of. What she actually said to him is, you don't know me; isn't that correct? That's what she said to him, you don't know me? A: No.
>
> Q: Mr. Benitez, you understand . . . you were deposed by me back in March? A: Yes.
>
> Q: And do you recall me asking you tell me what Miranda was saying and tell me what Juan was saying? Do you remember me asking you those questions? A: Yeah.
>
> Q: Okay. Now, at no time when I deposed you under oath in March did you ever say that Miranda said you don't know what I'm capable of? You never told me that then, did you? A: No. I don't think so. No.
>
> Q: So today . . . four months later, now you're telling me that that's what she said? A: Yes.

Alfaro testified that after Petithory went into the bedroom, he heard yelling—Petithory speaking English and Chavarria speaking Spanish—and Chavarria calling Petithory a "b*tch."[4] Petithory then exited the bedroom, grabbed bottles and cans from the kitchen, and went back in the bedroom, throwing them at Chavarria. Alfaro heard a bump that sounded as if someone fell into the wall, and Petithory said "ouch." Chavarria exited the bedroom first, with Petithory following, but he also testified he saw Chavarria push Petithory outside the bedroom door. The two then circled each other in the kitchen with Chavarria in front and Petithory following. The group was telling the two to calm down, but they continued yelling at each other, with Chavarria saying Petithory should "calm down" and "shut up." After the two were in the living room, Petithory pulled her switchblade knife from inside her bra and stabbed Chavarria. Alfaro further noted Chavarria was smaller than Petithory.

Ramirez testified that, after coming back to Alfaro's residence, Petithory "said nobody is going to disrespect my homie's apartment," at which point she went into the bedroom, looking "mad." Chavarria and Petithory proceeded to yell at each other. Ramirez heard "slapping," and Petithory saying something about hitting a woman. Chavarria then exited the bedroom backwards, with Petithory following him, and the two continued yelling at each other. He further stated Petithory was hitting Chavarria "all the time" while Chavarria said, "[Y]ou're crazy. Just leave me alone. I don't want to hit you. Just leave me alone." Petithory

---

[4] The transcript shows the Spanish word is "puta," which, according to the Spanish-English Dictionary, means whore or prostitute; whereas Alfaro testified the word means "bitch." *See* David L. Gold & Margaret H. Raventos, *Random House Webster's Spanish-English English-Spanish Dictionary* 485 (2d ed. 2006).

responded, "you don't know me and you don't know what I'm capable of." After the two went into the living room, he saw Petithory stab Chavarria.

In her testimony, Petithory characterized the events in the following manner. She stated she went into the bedroom to find her keys,[5] but she did not know Chavarria was in the bedroom. She asked him where her keys were located, and he became angry, calling her a "b*tch" and other curse words in Spanish. She asked why he was being disrespectful, and he shoved her; so she pushed him back and asked, "[W]hy are you hitting me?" She stated he was standing in front of the door, so she threw a beer can at him and pushed him backwards in order to leave the bedroom, at which point the two went into the front room of the apartment. She was feeling "scared" and asking why the other men were not helping, as they were speaking in Spanish and she could not understand them.

With regard to the stabbing, Petithory testified that as she and Chavarria were in the living room, she attempted to go to Melvin so they could leave when Chavarria began walking towards her, yelling. She became frightened and wanted to keep him away from her, so she took the knife out of her bra as "an intimidation so that he would stay away from me. And when he started coming towards me, I was scared he was going to take it." At that point she jabbed him once, he fell, and she began crying and apologizing. She testified she did not intend to cause his death. Evidence established she had the knife for approximately one month before the stabbing and that it had a double-edged blade.

---

[5] Evidence at trial established Petithory's keys were later located in Chavarria's pocket.

Additionally, Alfaro, Melvin, and Ramirez testified nobody was blocking the door and it was possible for Petithory to leave. While Petithory acknowledged she could have left the apartment during the altercation, she stated she did not feel she could leave through the other exit, a side door, "[b]ecause there was two locks on that door and it's hard to open." Evidence further established that Petithory lied on several occasions, stating she did not remember the events "[b]ecause [she] didn't want to get into detail and explain to anybody what had happened."

On January 8, 2014, Petithory was charged with murder in the first degree, a class "A" felony, in violation of Iowa Code sections 707.1 and 707.2(1)(a) (2013). She filed a notice of defense, intending to rely on the affirmative defenses of intoxication and justification at trial. On June 25, 2014, Petithory filed a motion in limine that sought to exclude the following: (1) any evidence or testimony that Petithory invoked her constitutional rights; (2) any video or audio tape evidence from the police station; (3) any evidence or testimony concerning Petithory's state of mind and/or emotions; (4) any evidence or testimony concerning her fear or lack of fear of the victim; (5) any evidence or testimony that Petithory was not acting in self-defense; (6) any evidence or testimony from Cerbellon; (7) any evidence or testimony regarding the knife found in Petithory's car; and (8) any evidence or testimony that Petithory obtained drugs. She also filed a motion under Iowa Rule of Evidence 5.104, specifically requesting the district court exclude evidence regarding a videotape of Petithory, taken at the police station, which took place prior to her having been

read her *Miranda* rights.[6]  On June 27, she also filed a motion to suppress statements she made to Officer David Cerne after he escorted her to his police vehicle, arguing she was in custody without having been read her *Miranda* rights.[7]

A hearing on these motions was held on July 2, 2014, and the court in large part granted Petithory's motion in limine.  With respect to the motion to suppress, the court ruled Petithory had been in custody when sitting in Officer Cerne's vehicle, and because she had not been read *Miranda* warnings, any statements she made to Officer Cerne during that time were to be excluded from evidence.  However, the court denied Petithory's rule 5.104 motion as to the videotaped statements at the police station.  Regarding the State's request that evidence of the witnesses' immigration status be excluded, the court noted that immigration status alone is not relevant as a means of impeachment; nonetheless, the evidence might be relevant if Petithory could make a showing, through an offer of proof, that a witness had applied for a U-Visa.[8]

Trial commenced on July 14, 2014.  During trial, Petithory made an offer of proof attempting to establish Alfaro had inquired about applying for a U-Visa

---

[6] This recording of her in the police station included statements she made to police—namely, that she did not know what happened to Chavarria—as well as phone calls she made to various family members.

[7] This evidence included a videotape of her in the police vehicle, during which time she appeared upset and repeatedly told the officer she did not see what happened but, rather, was in another room at the time of the stabbing.

[8] A U-Visa is a nonimmigrant visa set aside for victims of crimes.  *See Victims of Criminal Activity: U Nonimmigrant Status*, United States Citizen & Immigration Services, https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status (last visited Jan. 14, 2016).  As the State characterized the U-Visa at oral argument, it is an assurance for witnesses and victims of crimes so they may come forward to testify without fear of deportation.

before his trial testimony based on his connection with the crime. The district court ruled evidence of Alfaro's immigration status was inadmissible for lack of relevance. Additionally, during trial, Petithory's counsel withdrew the already-granted motion to suppress, which allowed the State to introduce evidence, including a video, of statements Petithory made while in Officer Cerne's custody detained in his vehicle. Following the close of evidence, the jury found Petithory guilty of murder in the second degree, in violation of Iowa Code sections 707.1 and 707.3. Petithory appeals.

## II. Standard of Review

We review sufficiency-of-the-evidence and evidentiary claims for correction of errors at law. *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005). Our review of ineffective-assistance-of-counsel arguments is de novo. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006).

## III. Sufficiency of the Evidence

Petithory first asserts the court erred when it denied her motion for judgment of acquittal, as there was not sufficient evidence to support the jury's guilty verdict. She argues evidence established she was justified in stabbing Chavarria because her testimony demonstrated she acted reasonably and in self-defense. Therefore, she claims the evidence does not support the jury's finding that she acted with malice aforethought, which is necessary for her conviction for second-degree murder.

When reviewing challenges to the sufficiency of the evidence, we view the record in the light most favorable to the non-moving party—here, the State; additionally, we make all legitimate inferences and presumptions that may be

reasonably deduced from the evidence. *State v. Buenaventura*, 660 N.W.2d 38, 48 (Iowa 2003). "We consider all evidence, not just that of an inculpatory nature." *Id.* If substantial evidence supports the verdict, we will affirm. *Id.* Evidence is substantial if it would convince a reasonable trier of fact the defendant is guilty beyond a reasonable doubt. *Id.*

To convict Petithory of murder in the second degree, the State was required to show Petithory killed Chavarria with malice aforethought. *See* Iowa Code §§ 707.1, 707.3. With regard to the element of malice aforethought, our supreme court has noted:

> [It is] an essential element of second-degree murder and is an element that separates second-degree murder from other lesser included offenses. Malice aforethought is defined as a fixed purpose or design to do some physical harm to another existing prior to the act complained of; it need not be shown to have existed for any length of time before . . . . [I]t is sufficient if such purpose was formed and continued to exist at the time of the injury.
>
> The law allows a presumption of malice aforethought from the use of a deadly weapon in the absence of evidence to the contrary. Thus, the presumption is only permissive. And the presumption may be rebutted by evidence showing the killing was accidental, under provocation, or because of mental incapacity. Although motive for the killing is not a necessary element of second-degree murder, absence of such motive may be considered on the question of whether the defendant acted with malice aforethought.

*State v. Reeves*, 670 N.W.2d 199, 207 (Iowa 2003). Additionally, we note this element may be established by circumstantial evidence. *Id.*

The use of a deadly weapon is enough to create the presumption of malice aforethought. *See State v. Haffa*, 71 N.W.2d 35, 44 (Iowa 1955) (noting the State offered "sufficient proof to raise the presumption of malice [aforethought] by the admitted use of the deadly weapon"). Pursuant to Iowa

law, a switchblade knife is a dangerous weapon. *See* Iowa Code § 702.7 ("Dangerous weapons include but are not limited to any offensive weapon, pistol, revolver, or other firearm, dagger, razor, stiletto, *switchblade knife*, knife having a blade exceeding five inches in length, or any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person." (emphasis added)). Thus, there is a presumption Petithory acted with malice aforethought. However, this presumption may be rebutted by a showing of justification. *Reeves*, 670 N.W.2d at 207–08.

With regard to the defense of justification, Iowa Code section 704.3 states: "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any imminent use of unlawful force."[9] Self-defense can be established by a showing

---

[9] The jury instructions for the justification defense stated:

> Instruction No. 19
> The defendant claims she acted with justification.
> A person may use reasonable force to prevent injury to a person, including the defendant. The use of this force is known as justification.
> Reasonable force is only the amount of force a reasonable person would find necessary to use under the circumstances to prevent death.
> A person can use deadly force against another if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.
> The State must prove the defendant was not acting with justification.
> Instruction No. 20
> A person is justified in using reasonable force if she reasonably believes the force is necessary to defend herself from any imminent use of unlawful force.
> If the State has proved any one of the following elements, the defendant was not justified:
> 1. The defendant started or continued the incident which resulted in death.
> 2. An alternative course of action was available to the defendant.

that, under the circumstances of the crime, a person of ordinary reason would believe they were in imminent danger of losing life or suffering great bodily harm. *State v. Badgett*, 167 N.W.2d 680, 684 (Iowa 1969). Reasonable force is defined as:

> [T]hat force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat. Reasonable force, including deadly force, may be used even if an alternative course of action is available if the alternative entails a risk to life or safety, or the life or safety of a third party, or requires one to abandon or retreat from one's dwelling or place of business or employment.

Iowa Code § 704.1.

The burden is on the State to prove beyond a reasonable doubt the lack of justification; it may do so by establishing one of the following: (1) the defendant was the provocator in initiating or continuing the difficulty which resulted in the assault; (2) the defendant did not believe she was in imminent danger of death or injury and the use of force was not necessary to save her; (3) she did not have reasonable grounds for such belief; or (4) the force used was unreasonable. *State v. Coffman*, 562 N.W.2d 766, 768 (Iowa Ct. App. 1997); *see also* Iowa Code § 707.11.

Given these standards, considering all the evidence but viewing the evidence in the light most favorable to the State, we conclude sufficient evidence

---

3. The defendant did not believe she was in imminent danger of death or injury and the use of force was not necessary to save her.
4. The defendant did not have reasonable grounds for the belief.
5. The force used by the defendant was unreasonable.

supports the guilty verdict. Specifically, a reasonable person could determine beyond a reasonable doubt that Petithory was not justified in stabbing Chavarria, as she did not have a reasonable belief that the use of force was necessary to save herself; furthermore, a reasonable person could conclude the force she used was unreasonable.

The evidence supporting Petithory's second-degree-murder conviction includes several witnesses testifying the two were fighting prior to the stabbing, with Petithory telling Chavarria that he had to clean up the mess he created in the apartment. Chavarria then called Petithory "puta," among other Spanish curse words. The two were yelling at each other continuously, and Alfaro testified she retrieved bottles from the kitchen and threw them at Chavarria while he was in the bedroom. Though testimony indicates there was a shoving match between Chavarria and Petithory while they were in the bedroom, when the two were within the witnesses' lines of sight, Chavarria did not strike Petithory.

Additionally, Alfaro described Chavarria as a "skinny guy," smaller than Petithory. He testified that Chavarria never touched Petithory while they were circling the apartment, Chavarria did not have a weapon, and Petithory never asked for help. Ramirez and Melvin also testified they heard Petithory tell Chavarria, "[Y]ou don't know me and you don't know what I am capable of." While they circled the apartment three or four times, Chavarria was telling Petithory in Spanish to calm down and shut up. Furthermore, Melvin testified he saw a knife in her hands—though he was not sure it was open—after which he told her in English to calm down; however, when he turned back around, Chavarria had been stabbed in the chest.

From this evidence the jury could have determined Petithory formed malice aforethought, as required for a second-degree murder conviction. *See Reeves*, 670 N.W.2d at 207; *see also Buenaventura*, 660 N.W.2d at 49 (noting circumstantial evidence is generally used to establish malice aforethought). Specifically, there was a break in the confrontation after Petithory pulled out her switchblade knife, which provided enough time to form malice aforethought. *See Reeves*, 670 N.W.2d at 207; *see also State v. Artzer*, 609 N.W.2d 526, 530 (Iowa 2000) (noting "[t]he intent to inflict harm . . . need not exist for any period of time prior to the act"). Additionally, the fact she used a switchblade knife also creates a presumption she acted with malice aforethought. *See State v. McNamara*, 104 N.W.2d 568, 572 (Iowa 1960) (holding that the presumption of malice aforethought arises from the use of a deadly weapon "unless there is an explanation to the contrary showing a legal excuse such as self-defense"); *see also* Iowa Code § 702.7 (defining dangerous weapon).

While Petithory points to her claim that Chavarria pushed her while they were in his bedroom, as well as his outbursts earlier that night towards Alfaro, Chavarria's aggression did not continue after the two went into the apartment's front room. Moreover, though she claims that Chavarria began walking towards her just before she took out her knife, the other witnesses did not corroborate that claim; nor did they corroborate her assertion that she asked for their help during the incident. At the very least, this requires a credibility finding, which is a determination that is within the province of the jury. *See State v. Dudley*, 856 N.W.2d 668, 677 (Iowa 2014). Thus, while there is differing testimony, given that credibility determinations are within the domain of the jury, we decline to give

more weight to Petithory's testimony and characterization of the events, even though it would support her defense of justification. We conclude that, viewing the evidence in the light most favorable to the State, a reasonable fact finder would conclude the State proved beyond a reasonable doubt Petithory was not justified; consequently, sufficient evidence supports her second-degree murder conviction. *See McNamara*, 104 N.W.2d at 572 (noting sufficient evidence supports a conviction for murder in the second degree when malice aforethought is established and the State proved beyond a reasonable doubt the defendant's actions were not justified).

## IV. Evidence of U-Visa

Petithory further claims the district court abused its discretion when it denied her motion in limine requesting she be able to cross-examine Alfaro about his attempt to obtain a U-Visa. During the offer of proof, she asserted it was established he inquired about obtaining a U-Visa to obtain temporary legal status in connection with his testifying for the prosecution. Therefore, she claims this issue was germane to his credibility and the district court erred when excluding it as not relevant.[10]

---

[10] She further argues the district court's refusal to allow her to cross-examine Alfaro on this issue violated her Sixth Amendment right to confront the witnesses against her; however, this claim was only briefly mentioned at trial and no specific arguments were presented to the district court. Consequently, the court based its ruling on the relevancy of the evidence and not on any constitutional assertion. Therefore, Petithory has failed to preserve error. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012). Nonetheless, Petithory raises this claim in the alternative through the ineffective-assistance-of-counsel rubric. Assuming counsel should have raised the Confrontation Clause as a basis to support the request to cross-examine Alfaro about his U-Visa application, we conclude any error by counsel would not have affected the outcome of the trial. *See Straw*, 709 N.W.2d at 133 (noting a defendant has to prove both that counsel failed to perform an essential duty and that counsel's failure resulted in prejudice). Multiple witnesses consistently testified Petithory was the aggressor in the

When making evidentiary rulings, the district court has wide discretion, and its decisions are reversed only for a demonstrated abuse of discretion. *State v. Sallis*, 574 N.W.2d 15, 16 (Iowa 1998). Abuse is found where a district court exercised its discretion on grounds or for reasons clearly untenable, or to an extent clearly unreasonable. *State v. Bayles*, 551 N.W.2d 600, 604 (Iowa 1996).

We do not agree with Petithory's assertion the district court abused its discretion when it denied the admission of evidence regarding Alfaro's U-Visa. As the district court stated in its ruling:

> [T]his [issue] is a question of balancing the interests. The court has to strike a balance between the defendant's rights of cross-examination, which as counsel indicated, are guaranteed to her both by the Iowa and United States Constitutions, but I have to balance that also against making sure any evidence that is offered or admitted in this case is relevant in that it would prevent any unfair prejudice.
>
> In this case, it is clear from Mr. Alfaro's statements during the Offer of Proof that he had absolutely no knowledge about a U-Visa or anything of that nature until subsequent to him giving his statement to the police on the day that this homicide occurred. He sought, apparently, some counselling or support from Polk County Crisis and was informed this process regarding a U-Visa based upon his—apparently his status as a witness, although Exhibit A indicates his status as a victim. It is clear from the hand-written parts of that application, that he is a witness to the homicide.
>
> . . . .
>
> In order for the evidence to be relevant, it has to establish that there's been some prosecutorial inducement for the witness's cooperation. It can't be evidence that invites the jury to speculate. The court certainly understands the defense argument; however, based upon the fact that this witness's statement was given at the time of the offense and at least there's been no indication in this record that the witness has waffled, I guess for lack of a better legal term, on his testimony—there's been no indication from either side that this witness's testimony has been anything other than consistent from his initial statement and his statement in the

---

altercation with Chavarria, and thus, we conclude that undermining Alfaro's credibility by bringing to the jury's attention his U-Visa application would not have changed the outcome of the trial. *See id.*

deposition and the testimony given on direct examination here today, I cannot conclude based upon this record that there has been any prosecutorial inducement for the witness's cooperation.

Based upon that, this evidence that the court would allow on cross-examination, would just, quite frankly, invite the jury to speculate and would give an adverse inference regarding the witness's immigration status and the immigration status alone, as the court already indicated, I do not find relevant.

If there had been some prosecutorial inducement or some action on the part of the state that even arguably could have influenced this witness's testimony in this proceeding, I think it would be admissible, but I don't think there's been a showing for that in this matter.

The record supports the court's summation of the facts, and we conclude the court did not abuse its discretion. *See id.*

## V. Ineffective-Assistance-of-Counsel Claims

A defendant may raise an ineffective-assistance claim on direct appeal if the record is adequate to address the claim. *Straw*, 709 N.W.2d at 133. We may either decide the record is adequate and issue a ruling on the merits, or we may choose to preserve the claim for postconviction proceedings. *Id.* To succeed on this claim, the defendant must show, first, that counsel breached an essential duty and, second, that she was prejudiced by counsel's failure. *Id.*

### A. Motion for New Trial

Petithory first contends trial counsel was ineffective for failing to file a motion for new trial, asserting the weight of the evidence did not support the jury's verdict. Relying on the same facts set forth in her sufficiency-of-the-evidence argument, Petithory asserts the greater weight of the evidence did not support the jury's finding she acted with malice aforethought. Therefore, she argues, she should be granted a new trial.

With regard to the standard applied when evaluating motions for new trial, the district court must determine whether a greater amount of credible evidence supports one side of an issue more than the other. *State v. Ellis*, 578 N.W.2d 655, 658 (Iowa 1998). Included in this determination is an assessment of the credibility of witnesses. *Id.* However, the motion should only be granted for cases in which the evidence weighs heavily against the verdict, so as not to diminish the jury's role as the principal fact-finder. *Id.* at 659; *see also Reeves*, 670 N.W.2d at 203 (noting that when the evidence is such that reasonable minds could differ, the district court should not disturb the jury's findings).

Particularly in light of our recitation of the evidence supporting Petithory's conviction, she has failed to establish she was prejudiced by counsel's failure to move for new trial. As noted above, the evidence supporting Petithory's conviction includes her use of a deadly weapon—which creates a presumption of malice aforethought—as well as the witnesses who testified she was the aggressor at the time she took out her knife, waved it around, and then stabbed Chavarria. Moreover, the credibility of the witnesses does not weigh heavily against the guilty verdict. *See Ellis*, 578 N.W.2d at 659 (stating "we caution trial courts to exercise this discretion carefully and sparingly when deciding motions for new trial based on the ground that the verdict of conviction is contrary to the weight of the evidence").

Based upon this analysis, we conclude the district court would not have granted a motion for new trial, if it had been made by counsel. Given that the motion would have been denied, trial counsel was not ineffective for failing to so

move.  *See State v. Greene*, 592 N.W.2d 24, 29 (Iowa 1999) (holding counsel is not ineffective for failing to pursue a meritless issue).

### B. Withdrawal of Motion to Suppress

Petithory's final argument asserts trial counsel was ineffective when she withdrew Petithory's motion to suppress, which had already been granted by the district court.  She claims that, because the court had already ruled the State was not allowed to enter into evidence the video-recording that revealed statements she made to Officer Cerne while in his police vehicle, counsel breached an essential duty by withdrawing the motion to suppress, which resulted in prejudice to her because the jury was allowed to hear evidence that violated her constitutional rights.  Therefore, she argues, she should be granted a new trial.

"Ordinarily, ineffective assistance of counsel claims are best resolved by postconviction proceedings to enable a complete record to be developed and afford trial counsel an opportunity to respond to the claim."  *State v. Truesdell*, 679 N.W.2d 611, 616 (Iowa 2004).  Upon review of the record before us, the determination of whether trial counsel was ineffective for withdrawing the motion to suppress requires a more expansive record than the one present before our court, which would include trial counsel's explanations of any strategic reasons for the action taken.  Therefore, we preserve Petithory's claim for possible postconviction-relief proceedings, where a more complete record may be established.  *See* S*traw*, 709 N.W.2d at 133.

**VI. Conclusion**

For these reasons, we affirm Petithory's conviction for murder in the second degree, but preserve for possible postconviction-relief proceedings her claim that counsel was ineffective for withdrawing the motion to suppress.

**AFFIRMED.**