# IN THE COURT OF APPEALS OF IOWA

No. 16-1672
Filed March 7, 2018

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**RANDALL THOMAS PAYNE,**
     Defendant-Appellant.

_____

Appeal from the Iowa District Court for Des Moines County, Mark E. Kruse,

Judge.

Randall Payne appeals his conviction of child endangerment resulting in

death following a jury trial. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Melinda J. Nye, Assistant

Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney

General, for appellee.

Considered by Doyle, P.J., and Tabor and McDonald, JJ.

**DOYLE, Presiding Judge.**

Following a two-week jury trial involving a battle of medical experts as to the cause of Randall Payne's infant son's death, Payne was found guilty of involuntary manslaughter by commission of a public offense, child endangerment resulting in serious injury, and child endangerment resulting in death. He was convicted of child endangerment resulting in death.[1] Payne now appeals his conviction, asserting the district court erred (1) by submitting a flawed model jury instruction that improperly allowed the jury to consider Payne's out-of-court statements "just as if they had been made at trial" and (2) in denying his motion for new trial, based on the State's late disclosure of potentially exculpatory autopsy evidence. We affirm.

### I. Background Facts and Proceedings.

Stacy Newton and Randall Payne are the parents of C.P., born October 18, 2014. Before the child's birth, in the first trimester of Stacy's pregnancy, Stacy received abnormal test results indicating the child had an increased risk of a genetic disorder. She was referred to the University of Iowa Hospitals and Clinics Fetal Diagnosis and Treatment Unit for additional testing, and she was examined there in May, June, and July of 2014. Ultimately, an alternative screening test returned a negative test result for the genetic disorder. However, the child's estimated fetal weight remained below average over the course of those months,

---

[1] At sentencing, the trial court merged the lesser-included offenses of involuntary manslaughter by commission of a public offense and child endangerment resulting in serious injury into the child-endangerment-resulting-in-death offense. *See* Iowa Code § 701.9 (2014).

increasing the risk of stillbirth. Consequently, the pregnancy was considered to be high-risk.

On October 16, 2014, approximately a week before her estimated due date, Stacy had a routine appointment with her general obstetrician. At that time, an ultrasound showed the child's estimated weight had gone down since Stacy's prior appointment, further increasing the risk of stillbirth. At the recommendation of her physician, Stacy agreed to have labor induced that evening. Drugs were administered to Stacy for that purpose, but after almost two days without progress, the child was delivered via a Cesarean section without incident, weighing 5.41 pounds.

Even though the child was ultimately born by way of a C-section, the child's head was described after the birth as having "considerable molding," which commonly occurs during a vaginal birth.[2] Along with "considerable molding" of the head, "a small caput"—a spot where fluid has gathered underneath the scalp— and a small amount of bruising on the right side of the child's head were noted.[3] These conditions, like molding, are not uncommon following vaginal labor and, given the length of Stacy's labor before the surgery, did not concern her physicians. The child's physical condition at the time of his birth was assessed as excellent.[4]

---

[2] *See also Taber's Cyclopedic Medical Dictionary* 1482 (Donald Venes ed., 21st ed. 2009) (hereinafter "*Taber's*") (defining "molding" as "[s]haping of the fetal head to adapt itself to the dimensions of the birth canal during its descent through the pelvis").

[3] *See also Taber's* at 360 (stating that "caput succedaneum" is "[d]iffuse edema of the fetal scalp that crosses the suture lines. Head compression against the cervix impedes venous return, forcing serum into the interstitial tissues. The swelling reabsorbs within 1 to 3 days").

[4] At an infant's first and fifth minute of life, medical professionals generally perform a rudimentary assessment of the baby's cardiovascular, respiratory, and nervous systems,

C.P. and Stacy were discharged from the hospital on October 22, 2014. Other than a bit of jaundice, for which Stacy and the child were to return the next day for continued treatment, the child was essentially found to be healthy. By the time of their release, the molding, the caput, and the bruising of C.P.'s head had gotten better; the child's head was reported to be "[n]ormocephalic with open soft fontanelle"—normal with a soft spot.[5]  C.P.'s discharge summary also reported:

> Eyes: Good red reflex.
> ENT: Palate intact.
> Neck: Supple without masses or adenopathy[6].
> Chest: Clear to auscultation.[7]
> Cardiovascular: Quiet precordium[8] with regular rhythm.  S1 and S2 normal.[9]  No murmurs are audible.  He has good femoral pulses.
> Abdomen: Soft without masses or visceromegaly.[10]  Cord remains intact without evidence of inflammation.
> GU[11]: Normal prepubertal male.  He is circumcised.  Testes are descended bilaterally.

and, based upon an established scale, assign a numerical score, known as an Apgar score.  See 2 Christine Stewart & Betty Brutman, Attorneys Medical Advisor § 14:253 (Westlaw 2017); see also Taber's at 160, (discussing "Apgar score").  "A score of 10 is optimal, while a score of four or less often suggests a serious degree of neonatal asphyxia requiring immediate attention." 2 Steven E. Pegalis, Am. Law Med. Malp. § 12:9 (Westlaw 2017); Taber's at 160 (noting scores of "7 to 10" indicate a "good to excellent" physical condition, "4 to 6" a fair physical condition, and "less than 4" to "poor condition").  The surgical documentation following Stacy's C-section stated C.P.'s "Apgars ended up being 10 and 10."

[5] See also Taber's at 407, 891, 1596 (defining "normo-" as a "[p]refix indicating normal," "cephalic" as "[c]ranial," and fontanelle as an "unossified membrane or soft spot lying between the cranial bones of the skull of a fetus or infant").

[6] Adenopathy generally refers to swollen or enlarged lymph nodes.  See Taber's at 48.

[7] Auscultation is listening, generally with a stethoscope, for internal sounds within the body, such as from the chest, neck, or abdomen, to evaluate organ health.  See Taber's at 216.

[8] The precordium is the "area on the anterior surface of the body overlying the heart and lower part of the thorax."  Taber's at 1868.

[9] S1 and S2 refer to "[n]ormal first and second heart sounds."  Taber's at 2060.

[10] "Generalized enlargement of the abdominal visceral organs" is called "visceromegaly."  Taber's at 2469.

[11] "GU" is the medical abbreviation for "genitourinary."  Taber's at 2577.

BJM[12]: Normal hip mobility without evidence of subluxation.[13]

Skin: Patient is icteric[14] but without rashes.

Gen.: Good suck and Moro. Good tone and cry.[15]

About one week after Stacy and C.P. were discharged from the hospital, Payne and Stacy took the child to the emergency room. The hospital documentation from the visit stated:

Chief Complaint: [Payne] reports [C.P.] has not moved [both lower extremities] on own since birth. Father reports he has been doing leg exercises on [child]. [Child] now cries in pain when [both lower extremities] moved.

. . . .

[C.P.] presents with lower extremity pain. The onset was 2 days ago. The course/duration of symptoms is constant. Type of injury: none. Location: Left thigh. The character of symptoms is pain. The degree at present is moderate. The exacerbating factor is movement. The relieving factor is none.

The child was physically examined and x-rays of the lower extremities were obtained. C.P.'s vital signs at that time were reported to be:

General: Appropriate for age.

Skin: Warm, dry, pink.

Head: Normocephalic, atraumatic.[16]

Neck: Supple.

Cardiovascular: Regular rate and rhythm.

Respiratory: Lungs are clear to auscultation.

Gastrointestinal: Soft.

Musculoskeletal: Leg position: Appropriate contraction of bilateral lower extremities for age.

---

[12] "BJM" is the medical acronym for "bones, joints, and muscles." *Dictionary of Medical Acronyms & Abbreviations* (Stanley Jablonski ed., 5th ed. 2005).

[13] "Subluxation" means "[a] partial or incomplete dislocation." *Taber's* at 2229.

[14] "Icteric" refers to jaundice. *See Taber's* at 1148.

[15] These descriptions refer to the doctor's observation of the infant's reflexes. Generally, from birth through the first month of life, an infant's psychomotor development includes having the "[a]bility to suck, swallow, gag, cry, and maintain eye contact with a person. Head needs to be supported. Loud noises may cause a startle reflex," also known as the "Moro reflex." *Taber's* at 1493-94, 1930-31, 1991-92.

[16] The term "atraumatic" means "[n]ot causing trauma or injury" or "[n]ot resulting from trauma." *Taber's* at 209.

The physician that reviewed the child's x-rays reported:

> Two projections were obtained. Positioning is less than optimal.
> The bony pelvis appear symmetric. The proximal femurs appear intact. I'm suspicious of bilateral congenital hip dislocation, but the femoral epiphysis are not ossified. Clinical correlation required. The femurs appear intact. The tibia and fibula are poorly visualized, but are grossly normal.

The child was discharged from the emergency room shortly thereafter, with the physician noting in the report that the child "appears in no distress" and that the parents "voice no concerns." The parents were directed to follow up with a physician within two-to-three days or return to the emergency room if the child's symptoms worsened.

C.P. had his two-week examination on November 3, 2014. Stacy conveyed concerns about the possibility of the child having a genetic abnormality, but the doctor, noting "the parents [were] not terribly sophisticated," reported the child "seem[ed] to be doing well at this point and clearly does not have [the genetic disorder] trisomy 18." The child's vital signs were stated as:

> Head: Nonnocephalic.
> Eyes: Good red reflex.
> ENT: No abnormalities noted. Palate intact.
> Chest: Clear to auscultation.
> Cardiovascular: Quiet precordium with regular rhythm. S1 and S2 are normal. No murmurs are audible.
> Abdomen: Soft without masses or visceromegaly. The child's cord is fallen off and there is no evidence of inflammation.
> GU: Normal prepubertal male. Circumcision is well-healed.
> Skin: No rash or icterus.
> BJM: No hip abnormalities noted.

The doctor's notes stated, "[b]ased on [C.P.'s] exam today, there are no signs of illness. There can be a lot of variation in what is normal for an infant and your concerns are natural. But, be assured that the symptoms that worried you are

normal for a baby of this age." The notes also indicated the doctor was going to "make arrangements for the child to be seen" at the University of Iowa in the genetic department, because it was possible "they ha[d] some familiarity with the concerns regarding the pregnancy that [were] not available to us at this time."

On November 9, 2014, around 5:30 p.m., Payne called 9-1-1. He told the operator "the baby was just eating, he just peed on me; now he's not breathing or nothing." The operator asked if the baby was choking, and Payne answered, "No. He's not breathing. He's just dead right now. I don't know what's going on." Payne began crying. When the ambulance crew arrived, the baby showed no signs of life or heart activity and was determined to be deceased. The only persons at the home were Payne, Payne's mother, Payne's one-year-old child, and C.P. Stacy was at work.

Payne told the responding deputy, "he changed the baby's diaper, fed the baby, laid the baby down on the bassinet and went to the bathroom, and he came back and found the baby unresponsive and not breathing." Payne told the deputy that the baby had been congested. C.P. had some bruising and marks on the left side of his face, which Payne told the deputy had occurred a few days before when "he was feeding the baby on his bed. When [Payne] got up, the baby rolled over and hit its face on [a car toy]." One paramedic described the bruise over the left eyebrow as "look[ing] like an old injury" that was in the healing process." No other trauma was apparent to the deputy.

After calling 9-1-1, Payne telephoned Stacy's place of employment. One of Stacy's coworkers told Stacy her son was not breathing. Stacy left immediately for home. She told officers that she had not noticed anything abnormal about the

baby's behavior the previous evening, but she said the child had not been awake. She also said she had not seen any bruises, scrapes, cuts, or other marks on the child before the child's death. Payne told Stacy the baby had been acting normally before his death, but Payne did say to her, multiple times, "It's my fault. It's my fault." She told the officers about Payne's comments and said she did not know what Payne had meant, but she guessed it was because "maybe he didn't do enough" to save the child.

An autopsy was performed November 11, 2014, by University of Iowa Hospitals and Clinics (UIHC) pathologist Dr. Dennis Firchau, and he consulted two other UIHC pathologists, Dr. Patricia Kirby, a neuropathologist who specialized in, among other areas, brain pathology, and Dr. Nasreen Syed, who specialized in ophthalmic pathology. Dr. Firchau observed bruising on the left side of the baby's face. His internal examination found fractures in some of the baby's ribs that were "in various stages of healing," as demonstrated by fracture calluses, which occur "at some more remote time period that have healed to some degree" and generally take "a couple of weeks . . . to form." There were fractures on top of the calluses on two of the ribs, indicating that an original fracture occurred and then a secondary fracture occurred at a later time. Some of the fractures were "somewhat hemorrhagic," which also indicated they had occurred more recent in time. The ribs fractured were not in an area prone to being broken while giving CPR. X-rays also showed C.P.'s left femur was fractured but showed some advanced stages of healing, which the pathologist opined meant the fracture likely occurred remote to the date of the child's death. In this child's age group, such fractures are "generally only seen in inflicted type[s] of trauma."

Additionally, C.P.'s skull had fractures, which indicated, in the opinion of the pathologists performing the autopsy, blunt force trauma to the area where the fractures occurred.  The scalp had contusions in various stages of healing—some of which the pathologist opined had likely occurred within days of the child's death, while others likely occurred at a more remote time.  The pathologist reported finding diffuse subdural hemorrhages.  The pathologist opined the subdural hemorrhage was "all recent," from the date of death to a few days back.  The pathologist also found "thymic involution," meaning the child's thymus—a lymphoid organ of the immune system located near the heart—was diminished in size, indicating the "child was stressed."[17]

Though the autopsy report was not finalized until April 2015, law enforcement officials had a phone conference with the primary autopsy pathologist the morning of November 12, 2014.  The pathologist informed the officers about the injuries C.P. sustained.  Payne was subsequently interviewed at the Burlington Police Department by law enforcement officials for over three hours.  Payne told the officers "he had been feeding [the baby], had just changed [the baby], and he himself needed to use the rest room, so he placed [the baby] in a crib and went to the bathroom, and when he returned, [the baby] was not breathing."  Payne said that when he was changing the baby, the baby urinated on him.  Payne told the officers "when he returned [from the restroom], [the baby] was not breathing, and so . . . he initially tried to use infant CPR, which is using two fingers, and that did not work, so he started using adult CPR, which is using the palm."  Payne was

---

[17] *Taber's* at 1228, 2318 (defining "involution" and discussing the thymus).

asked about the baby's health, and he informed the officers that the baby had had a respiratory problem, a problem with his leg, and a bruise by his eye from the incident on the bed. Payne told the officers that "[n]obody else would have had the opportunity" to injure or hurt the baby.

The interview became more confrontational, with one of the officers telling Payne he knew the nature of some of the injuries the baby had sustained. Payne told the officers "he was unsure of how those injuries occurred and made a comment that he never beat his child or didn't recall beating his child, so he would have no explanation as to why those injuries were there." Payne again explained how the bruise under the baby's eye occurred. The baby and Payne were on Payne's bed, and when Payne got up off his bed, the baby moved in a manner that caused a toy car on the bed to hit him in the eye. Payne also said "a couple days prior to the incident he had been placing [the baby] into his crib and hit [the mobile] above the crib with [the baby's] head." The officer told Payne the baby's injuries had been "too severe to have occurred" in that incident. Payne then stated the baby "was fussing and he couldn't get him to stop and was frustrated with [the baby], so he had dropped him into his crib from about six inches away." Payne was asked if there was anything else that had happened to the baby "that would explain the injuries." Payne recalled that a few days before the baby's death, he had accidentally kicked the child's car seat. He explained the child had been seated in his car seat, which was inside the house and sitting on the hard floor, and Payne was rocking the car seat with his foot and "may have rocked too hard, kicking the car seat, knocking [the baby] out of the car seat onto the floor and [the baby] did two or three somersaults." He also said he had been exercising the

child's legs, kind of like riding a bike, and may have done that too hard. One of the officers told Payne he did not believe these events would have caused the injuries the child sustained, and Payne told him he did not know of anything else that had happened to the child. The officer tried other approaches; he told Payne he believed Payne was holding back, the family needed closure, Payne needed to be honest, the officers needed answers, but Payne said he did not remember anything else that occurred that would have caused the injuries.

Stacy and Payne's mother were also interviewed. Payne's mother told law enforcement officials that all the child did was basically "eat and go to sleep." She said the child seemed alert on occasion, but when she was caring for him, "he seemed like he never ever would wake up. He just wanted to sleep." Payne's mother said she noticed the child had a bruise on his face a few days before he died, and Stacy and Payne told her the baby had rolled over onto a toy truck. Payne's mother told officers she believed Payne did not immediately call for her to come and assist him right away when he found the baby was not breathing because he panicked. She said after the fact, Payne was remorseful and thought "he should have done something else," should not have "went to the bathroom."

The final autopsy report was completed April 8, 2015, and the pathologist opined that the child died as a result of "[b]lunt force injuries of the head." The autopsy report listed numerous blunt force injuries of the child's head, including "[h]emorrhagic necrosis of the bilateral frontal and temporal lobes, right greater than left." Payne was subsequently charged with first-degree murder, multiple acts of child endangerment, and felony child endangerment. Payne pled not guilty, and

he retained medical experts that disputed the opinions reached by the State's pathologists.

A two-week jury trial commenced in May 2016. Payne opted not to testify in his defense. Stacy testified about the child's well-being and what she had told officers the day the child died. She testified when she saw the child the day before he died, there were times when the child "was awake, active and alert." However, she also testified the child "never really had his eyes open throughout [the] whole time he was alive" and slept the majority of the time. Stacy testified that in addition to the leg pain, she had noticed the child had some breathing issues, where he would gasp for air. She also testified a bubble had developed on the back of the child's head. She testified she believed she had told the officers about these issues, but she was unsure.

On the third morning of trial, prior to the State presenting expert testimony in its case-in-chief, the prosecutor advised the court it had learned one of its expert witnesses set to testify that day—Dr. Kirby, the neuropathologist who had consulted in the autopsy's findings—had prepared a demonstrative exhibit for trial. The prosecutor stated he had just learned of the exhibit and thus had not disclosed it to the defense prior thereto. The defense objected to the use of the demonstrative exhibit, noting the exhibit included photographs of histopathology slides not shared with the defense in violation of the parties' discovery agreement. The defense further noted it had not had the opportunity to prepare for cross-examination of the witness about the slides or to review the slides with Payne's own experts. The State agreed the pictures had not been given to the defense, but it maintained they were only "a pictorial depiction of what [the expert had]

already talked about in [her] deposition, and so [the defense] should [have been] prepared to talk about the very items that are portrayed in the stains and in the pictures." The defense proposed calling the witness at a later time, but the witness was not available to do so. The court then denied the State's request to use the demonstrative exhibit during its examination.

One of Payne's expert witnesses, Dr. Janice Ophoven, was set to testify on May 11, 2016—the seventh day of trial. In preparation of her testimony, she was shown on May 10 the previously undisclosed photographs contained in the unadmitted demonstrative exhibit, and she opined the undisclosed photos were "exculpatory in nature." Payne then filed a motion to dismiss the charges, arguing the State's failure to disclose these "exculpatory" photographs violated the state and federal constitutions as well as the parties' discovery agreement. Alternatively, Payne requested as a remedial action that the photographs be admitted into evidence and his expert be allowed to reference them while the exhibits were published to the jury. The State resisted the motion to dismiss, but it offered to allow Payne to admit the photographs so long as the State could use the photographs in its rebuttal of any witnesses it may recall. Payne agreed with the State's proposal and withdrew his motion.

Dr. Ophoven testified at length and opined the cause of the child's death was "complications of intracranial damage that led eventually to a clot . . . of the largest vein across the top of the head that interfered with normal function, circulation, and pressure inside the head, and led to cessation of life." Based upon the original evidence provided to her, Dr. Ophoven opined "that something terrible had been going on, on the surface of [the child's] brain, for weeks that [she] could

see in the tissue on the surface of the brain." However, Dr. Ophoven further opined that the newly disclosed photographs of the child's brain post-autopsy indicated the child's death was inevitable from intrauterine pathology. She testified that the child

> may have had a cord obstruction, he may have had an underlying medical condition that we didn't understand, but there is no question that this has nothing to do with events that took place . . . the day before he died.
> . . . .
> . . . [T]o my mind there really is no question this baby died from a tragic pre-existing set of conditions that likely were present in utero, compounded by his delivery, and eventually he—he just died, which is what little babies with really bad brains do, they just leave.

Dr. Ophoven agreed with the State's experts that the child's ribs and other broken bones showed healing, but she opined that the injuries would have had to date "all the way back to his birth . . . or before he was born in order for these fractures to be . . . that mature." She opined that one of the rib calluses was "fully mature," and since the child was "only three weeks old, [she would be] kind to say [the fracture was] three weeks old." Similarly, she testified the iron-stain sample from a blood clot showed the clot was "loaded with iron" indicating the clot could not "possibly have happened in a couple of days. This is weeks." Moreover, she opined the photographic evidence that was not previously disclosed showed parts of the child's brain was necrotic, including "the upper part of the cortex . . . where movement and cognitive thought and the functions of humanity . . . would serve him to have him participate in the world." She testified the area was "all dead. And it's not just dead, it's gone, which means the body . . . ha[d] attacked it to get rid of it, because dead tissue is not only not necessary, it's bad for the . . . surrounding tissue." She testified that she did not believe the autopsy report revealed the

degree and the severity of the child's brain damage and, "until [she] actually saw . . . the [undisclosed] pictures of the brain two days ago, [she] had no idea of the extent of the damage."

Dr. Ophoven testified there were no pictures from the autopsy of the child's brainstem. "What makes it possible for a baby to function right after they're born rests in the brainstem." She explained:

> If you have a brainstem, a baby can cry, a baby can sleep and wake up, but a baby does not have the ability to interact with their environment.
> Babies are born, unfortunately, all over the world, every day, without any of this tissue. They're called anencephalic. Their heads basically don't have anything above the brainstem. They cry, they sleep, they suck, they poop, they pee, and they can even have Apgars of 10 and 10, but without this, [the] baby will not then proceed over the next few weeks to—to gaze, to follow, to look, to smile, to learn where their arms are, learn where their feet are and learn how to intelligently and intentionally move. So a baby without any of this can be born alive and look just like that.
> Can [a] baby have this kind of horrible brain damage and be born alive? The answer is absolutely.

She understood how the bone fractures could "raise concerns," but having examined the bones and fractures, as well as the conditions of the child's life and the abnormalities to the bones themselves, she was "very comfortable" in finding "no indication that [the child] was fractured from violence."

Dr. Ophoven consulted a radiologist, Dr. David Ayoub, and Dr. Ayoub reviewed the child's x-rays. Dr. Ayoub opined the child had a metabolic bone disease—Rickets. Dr. Ayoub testified that "[a]cute fractures don't necessarily show up on an x-ray. We see them much easier when they heal, so if there's an acute fracture and it's proximate to CPR, the child has bone disease, all those things are plausible." Dr. Ayoub opined that other x-rays showed the presence of

bone disease in the child's skeleton, including the x-ray of the fractured left femur. Because that fracture is more obvious radiographically when healed and had started to heal, Dr. Ayoub explained it was more visible on the autopsy x-ray than the emergency-room x-ray taken approximately two weeks before the baby's death. Dr. Ayoub believed the child's femur was likely fractured at the time the child was taken to the emergency room. Ultimately, Dr. Ayoub opined the child's Rickets increased his risk for bone fractures.

The State's primary autopsy pathologist Dr. Firchau was recalled to the stand on rebuttal to discuss Dr. Ophoven and Dr. Ayoub's opinions. Dr. Firchau disagreed with Dr. Ayoub's diagnosis of Rickets, and he believed the fractures and other injuries occurred more recent to the child's death and not at birth or before, unlike both Dr. Ophoven and Dr. Ayoub. However, Dr. Firchau did not find surprising Dr. Ayoub's conclusion that the child's left femur fracture was present in the earlier October 28, 2014 x-ray, and Dr. Firchau agreed the child "very well could have had a fracture in his left femur" at that time. Dr. Firchau also pointed out that pictures in Dr. Kirby's demonstrative exhibit, which Dr. Ophoven had had the opportunity to review and testified about, showed the child's brainstem. Dr. Firchau testified Dr. Ophoven's testimony "that half of [the child's] brain was missing" was inaccurate. He opined the injuries the child sustained did not occur in utero and were sustained near the time of the child's death.

The matter was submitted to the jury Friday, May 13, 2016. The following Monday, the jury found Payne guilty of the lesser-included offenses of involuntary manslaughter by commission of a public offense and child endangerment resulting

in serious injury. The jury also found Payne guilty as charged of child endangerment resulting in death.

In its judgment entry, the district court merged the involuntary manslaughter by commission of a public offense and the child-endangerment-resulting-in-serious-injury offense with the child-endangerment-resulting-in-death offense. *See State v. Smith*, No. 14-1380, 2015 WL 6509731, at *5 n.5 (Iowa Ct. App. Oct. 28, 2015) (citing Iowa Code section 701.9, which provides "No person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted. If the jury returns a verdict of guilty of more than one offense and such verdict conflicts with this section, the court shall enter judgment of guilty of the greater of the offenses only"). The court entered judgment on the child-endangerment-resulting-in-death conviction and sentenced Payne to incarceration not to exceed fifty years.

Payne appeals the conviction, asserting the district court erred (1) in instructing the jury it could consider out-of-court statements made by Payne "just as if they had been made at trial" and (2) in not granting him a new trial after the State disclosed photographs late because it denied him a fair trial and effective assistance of counsel. We address his arguments in turn.

## II. Discussion.

### A. Jury Instructions.

Among the forty-seven instructions submitted to the jury, instruction number eleven was set forth in four subparts, one of which addressed contrary statements by the defendant. Over Payne's objection, the district court gave the following instruction in subpart C:

Evidence has been offered to show that [Payne] made statements at an earlier time and place.

If you find any of the statements were made, then you may consider them as part of the evidence *just as if they had been made at this trial*.[18]

(Emphasis added.) This instruction related to Stacy's testimony about out-of-court statements Payne allegedly made about his fault in the matter. On appeal, Payne concedes any statement he purportedly made out of court would generally be admissible under Iowa Rule of Evidence 5.801(d)(2) as a party-opponent, non-hearsay statement and, thus, did not challenge the admission of the evidence at trial. *See also State v. Cromer*, 765 N.W.2d 1, 8 (Iowa 2009); *State v. Bayles*, 551 N.W.2d 600, 606 (Iowa 1996). However, he argues the district court erred in submitting the instruction because the statement Payne allegedly made, as testified to by Stacy, was not taken from a deposition or trial and therefore not made under oath. He asserts there is a substantial difference between directing the jury to consider the statement as a sworn statement made under oath versus

---

[18] This instruction was based upon Iowa Criminal Jury Instruction 200.44, "Statements By The Defendant," which states:

Evidence has been offered to show that the defendant made statements at an earlier time and place.

If you find any of the statements were made, then you may consider them as part of the evidence, just as if they had been made at this trial.

*You may also use these statements to help you decide if you believe the defendant. You may disregard all or any part of the defendant's testimony if you find the statements were made and were inconsistent with the defendant's testimony given at trial, but you are not required to do so. Do not disregard the defendant's testimony if other evidence you believe supports it or you believe it for any other reason.

**Comment**

Caveat: The instruction should be given if the evidence includes one or more statements by the defendant that qualify as admissions under Iowa [Rule of Evidence] 5.801(d)(2)—Admission by a Party Opponent.

*The last paragraph should be used only if the defendant testifies.

The uniform instruction does not cite any authority beyond rule 5.801(d)(2). *See* Iowa Crim. Jury Instructions 200.44.

permitting the jury to determine the credibility of the statement and what weight to give the statement. He contends that difference means the jury was incorrectly instructed as a matter of law, presumptively prejudicing him, and he maintains the State cannot show the record affirmatively establishes otherwise. We disagree.

"In a criminal case, the district court is required to instruct the jury as to the law applicable to all material issues in the case." *State v. Becker*, 818 N.W.2d 135, 141 (Iowa 2012), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016); *see also* Iowa R. Civ. P. 1.924 (requiring the district court to "instruct the jury as to the law applicable to all material issues in the case"); Iowa R. Crim. P. 2.19(5)(f) ("The rules relating to the instruction of juries in civil cases shall apply to the trial of criminal cases."). No particular form of an instruction is required; "the court must merely give instructions that fairly state the law as applied to the facts of the case." *State v. Virgil*, 895 N.W.2d 873, 880 (Iowa 2017). "We review jury instructions as a whole to determine whether the jury instructions correctly state the law." *State v. Tipton*, 897 N.W.2d 653, 694 (Iowa 2017). Alleged errors in material jury instructions are reviewed for correction of errors at law, which requires us "to 'determine whether the challenged instruction accurately states the law and is supported by substantial evidence.'" *State v. Green*, 896 N.W.2d 770, 775 (Iowa 2017) (quoting *State v. Hanes*, 790 N.W.2d 545, 548 (Iowa 2010)). Prejudice is presumed and reversal required "unless the record affirmatively establishes there was no prejudice." *Hanes*, 790 N.W.2d at 551. Stated another way, a jury instruction submitted in error "does not warrant reversal unless it results in prejudice to the complaining party." *State v. Plain*, 898 N.W.2d 801, 817 (Iowa 2017). Prejudice occurs if the erroneous "instruction could

reasonably have misled or misdirected the jury." *State v. Hoyman*, 863 N.W.2d 1, 7 (Iowa 2015).

Here, Payne pled not guilty. In doing so, "every material allegation contained in the information" was at issue at trial. *State v. Hephner*, 161 N.W.2d 714, 720 (Iowa 1968). Any relevant statements he made out of court that are inconsistent with his position at trial were thus admissible, whether or not he testified. *See id.*; *see also* Iowa R. Evid. 5.801(d)(2). These statements are admissions and are "to be accorded the same weight as competent evidence." *Tamm, Inc. v. Pildis*, 249 N.W.2d 823, 834 (Iowa 1976); *see also In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012) (quoting this language).

The jury in this case was instructed it must consider all of the instructions together. Even though witnesses, before testifying, "must give an oath or affirmation to testify truthfully . . . in a form designed to impress that duty on the witness's conscience," Iowa R. Evid. 5.603, juries are still generally instructed, as the jury here was so instructed, on how to assess the credibility of those witnesses:

> Decide the facts from the evidence. Consider the evidence using your observations, common sense and experience. Try to reconcile any conflicts in the evidence; but if you cannot, accept the evidence you find more believable.
> In determining the facts, you may have to decide what testimony you believe. You may believe all, part or none of any witness's testimony.
> There are many factors which you may consider in deciding what testimony to believe, for example:
> 1. Whether the testimony is reasonable and consistent with other evidence you believe.
> 2. Whether a witness has made inconsistent statements.
> 3. The witness's appearance, conduct, age, intelligence, memory and knowledge of the facts.
> 4. The witness's interest in the trial, their motive, candor, bias and prejudice.

*See* Iowa Crim. Jury Instructions 100.7 (citing *State v Harrington*, 284 N.W.2d 244 (Iowa 1979) and *State v. Ochoa*, 244 N.W.2d 773 (Iowa 1976)). Consequently, requiring the jury to decide if Payne made the statements and, if so, consider the statements as if made at trial still required the jury to assess the evidence and decide whether it was credible. The instruction did not direct the jury to assign the statement any particular weight or unduly emphasize the matter, nor did it create an improper permissive inference or presumption. *See generally* 75A Am. Jur. 2d *Trial* § 1140 (2017) ("The trial court may not tell the jury what weight to give to the admissions of a party, the rank assignable to them, or the influence to be wielded by them, or use language tending to disparage admissions satisfactorily proved." (internal footnotes omitted)). It did not even instruct that the statements, if the jury decided they were made, must be considered as if they had been made at trial *under oath*. Looking at the instructions as a whole, the challenged instruction still left to the jury the question of whether the statements were an admission and the weight to be attached to them. Clearly, the instruction was not an incorrect statement of the law, and the judge's ruling was not in error. *See State v. Wineinger*, No. 16-1471, 2017 WL 6027727, at *3 (Iowa Ct. App. Nov. 22, 2017, petition for further review denied, Feb. 28, 2018) (stating the same instruction was a correct statement of the law); *State v. Tucker*, No. 13-1790, 2015 WL 405970, at *3 (Iowa Ct. App. Jan. 28, 2015) (stating the instruction was not misleading).

Additionally, we note that the language in instruction eleven—that the statements, if made, should be considered "as part of the evidence just as if they had been made at this trial"—appears necessary, though such language is not specifically approved of in any published opinion we have found. The jury in this

case was instructed it must base its verdict on the instructions and the evidence, defined as "[t]estimony in person or by deposition," "[e]xhibits received by the court," and stipulations. *See also* Iowa Crim. Jury Instructions 100.5. The alleged statements made by Payne do not fall in any of these categories, which would presumably mean the jury could not consider the statements if they decided they were made. However, admissions have long been admissible as substantive evidence in criminal cases. *See, e.g.*, *State v. Kidd*, 239 N.W.2d 860, 864 (Iowa 1976) ("We have also followed [Federal Rule of Evidence] 801 insofar as it excludes admissions from the definition of hearsay."); *Hephner*, 161 N.W.2d at 720 ("Adverse to defendant as inconsistent with his [not-guilty] plea and contradictory to the contention asserted in his testimony, this evidence constitutes an admission and may be introduced without the preliminary foundation required for that of a witness. It is admissible both for impeachment purposes and as substantive evidence of the fact to which it relates."). As such, the jury needed to be instructed how to consider the statements, if it found they had been made.

Finally, even if the challenged language should not have been submitted, we agree with the State the record affirmatively establishes there was no prejudice. The context in which the statements were allegedly made were put before the jury, and Payne's counsel had ample opportunity to cross-examine Stacy about the alleged statements. The jury was instructed that it was their exclusive province to determine the facts in the case and to weigh the evidence, and the jury returned lesser-included convictions on two of the charged crimes, including the first-degree-murder charge, wherein Payne's statements, if believed, would likely be the most relevant. We do not believe the jury could have been misled or

misdirected by the instruction, given the overall instructions. Consequently, any error in giving the instruction did not prejudice the jury.

### B. Late Disclosure of Evidence.

Payne also asserts the district court erred by denying his motion for new trial, arguing the late disclosure of the photographic evidence by the State denied him a fair trial and the effective assistance of counsel. The State concedes that its "mid-trial disclosure was untimely." However, it argues Payne waived the issue when he withdrew his motion to dismiss during the case and permitted the late evidence to come in. We agree.

A timely objection to the State's lack of compliance is required. *See State v. Leto*, 305 N.W.2d 482, 489 (Iowa 1981). Though Payne initially challenged the tardily disclosed photographs—and the district court had granted Payne's request that the evidence be excluded—he agreed to withdraw his motion and permit the admission of the photos. In withdrawing his motion to dismiss and agreeing to admit the evidence, he waived his complaint of its late disclosure. While Payne raised the matter again in his posttrial motion for new trial, it was too late. *See State v. Smith*, 81 N.W.2d 657, 661 (Iowa 1957).

But even if the matter had been preserved for our review, we would find it to be without merit. A district court should grant a motion for a new trial only in exceptional circumstances. *See State v. Ary*, 877 N.W.2d 686, 705 (Iowa 2016). The district court, which was closer to the actual trial than this court, has "discretion in granting or denying new trials based on fair trial considerations," and we generally will not reverse the ruling unless the court abused its discretion. *State v. LaDouceur*, 366 N.W.2d 174, 178 (Iowa 1985). Nevertheless, to the extent a

constitutional violation is claimed, our review is de novo. *See State v. Piper*, 663 N.W.2d 894, 914 (Iowa 2003), *overruled on other grounds by Hanes*, 790 N.W.2d at 551.

To be sure, it is the State's "duty to learn of any favorable evidence known to . . . others acting on the government's behalf in the case," and its reason for the nondisclosure is irrelevant. *DeSimone v. State*, 803 N.W.2d 97, 103 (Iowa 2011) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Yet, late evidentiary disclosures only violate a defendant's due process right to a fair trial if "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt." *Piper*, 663 N.W.2d at 904 (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

Assuming without deciding Payne could establish the first two elements— that the State suppressed evidence favorable to him—he cannot establish that the nondisclosed pictures were material to the issue of guilt under the circumstances of this case. Evidence is material if "there is a reasonable probability that . . . the result of the proceeding would have been different," meaning the nondisclosed, suppressed evidence undermines the trial's outcome. *State v. Romeo*, 542 N.W.2d 543, 551 (Iowa 1996) (citation omitted). Stated another way, "the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Harrington v. State*, 659 N.W.2d 509, 523 (Iowa 2003) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)). We consider the totality of the circumstances in deciding whether our confidence in the verdict is undermined, *see id.* at 523-24, including assessing whether the nondisclosure had an effect "on trial preparation and

strategy, not merely the weight of the evidence," *DeSimone*, 803 N.W.2d at 105, which is what Payne asserts here. We are unconvinced.

Although the State's actions may have delayed the preparation efforts of Payne's counsel, the late disclosures did not prejudice the actual presentation of Payne's defense. We recognize this case came down to a battle of experts; nevertheless, the newly disclosed photographs did not the reveal the proverbial "smoking gun" exonerating Payne. While Dr. Ophoven opined the photos were exculpatory, the photographs did not alter her overall opinion that the child's death was the result of natural causes, which the jury heard. Dr. Firchau's opinion was also unchanged; he did not believe the photos were exculpatory and testified they did not change his opinion that the child's death was caused by blunt force trauma. The jury heard Payne's expert's opinion about the significance of the photographs, and it heard the State's expert's reasons for disagreeing with her opinion. The jury had the opportunity to weigh all the relevant evidence and assess the experts' opinions. It even returned two lesser-included-offense convictions—notably, one of which was under the first-degree-murder charge. Upon our de novo review, considering the totality of the circumstances, it is simply not reasonable that, had the photographs been disclosed earlier, the case would have been recast in such a different light as to undermine confidence in the verdict. Consequently, the district court did not err in denying Payne's motion for a new trial.

### III. Conclusion.

Having considered the record, we conclude the district court did not err in instructing the jury to consider the out-of-court statements Payne allegedly made, if it first determined Payne made the statements, as if the statements had been

made at trial.  The instruction was not an incorrect statement of the law, but even if it were, it did not prejudice Payne.  Additionally, we conclude the court did not err in denying Payne's motion for a new trial for the State's late disclosure of autopsy photographs.  Though Payne did not preserve the alleged error for our review, we find the claim meritless, considering the totality of the circumstances.  For these reasons, we affirm Payne's convictions.

**AFFIRMED.**

McDonald, J, concurs; Tabor, J., dissents.

**TABOR, Judge.** (dissenting)

I respectfully dissent. I believe the instruction allowing the jury to consider Payne's out-of-court admissions "just as if they had been made at this trial" was an incorrect statement of law. Because that faulty instruction was prejudicial to Payne, I would reverse and remand for a new trial.

The night C.P. died, Payne repeated to Stacy: "It's all my fault, it's all my fault." Payne's statements were not hearsay and were admissible because they were offered against an opposing party. *See* Iowa R. Evid. 5.801(d)(2)(A). Admissions by a party-opponent "constitute substantive evidence of the facts asserted but are not conclusive evidence of those facts." *See State v. Bayles*, 551 N.W.2d 600, 606 (Iowa 1996). Critically, substantive evidence is not always the equivalent of sworn testimony. Payne's admissions were not made under oath and therefore did not have the same binding effect on the declarant. Unless admissions are made in open court, they will not warrant a conviction without sufficient corroboration.[19] Iowa R. Crim. P. 2.21(4); *State v. Polly*, 657 N.W.2d 462, 466 n.1 (Iowa 2003). In the absence of the oath, ability to observe the declarant's demeanor, and cross-examination to aid in determining credibility, the probative force of out-of-court statements differs from the probative force of in-court testimony. It was a mistake to instruct the jury on a false equivalency.

---

[19] As Payne points out, the uniform instruction on confessions by a defendant does not include a directive for the jury to consider the statements as if they had been made at trial. *See* Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 200.16 (2016). Rather, the jury is told to consider various circumstances under which the confession was made before deciding how much weight to give it. *Id.*

As the majority notes, the disputed language comes from a stock instruction. Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 200.44 (2016). We are "reluctant to disapprove uniform instructions." *See State v. Weaver,* 405 N.W.2d 852, 855 (Iowa 1987) (citing *State v. Jeffries,* 313 N.W.2d 508, 509 (Iowa 1981)). But uniform instructions are not "preapproved" by our supreme court. *See State v. Robinson*, 859 N.W.2d 464, 490 (Iowa 2015) (Wiggins, J., dissenting) (asserting "we can never delegate the formulation of the law to the instruction committee"). In this instance, the bar association's instruction committee did not cite any authority for treating a criminal defendant's unsworn out-of-court statements as the equivalent of in-court testimony offered under oath.[20]

The majority draws a distinction between telling the jurors they could consider Payne's out-of-court admissions "as if they were made at this trial" and telling them the admissions could be considered as if they were made *under oath*. In my view, that distinction is not meaningful; the jurors saw witnesses testify and knew statements made at trial were under oath. In addition, another subsection of jury instruction eleven discussed the hierarchy between "statements made before this trial while not under oath" by three other witnesses and "what the witnesses said in this trial." The clear implication of the challenged instruction was that

---

[20] This uniform instruction previously read: "Evidence has been offered to show the Defendant made statements at an earlier time and place while not under oath. These statements are called admissions. You may consider an admission for any purpose." *See State v. Tejeda*, 677 N.W.2d 744, 754 (Iowa 2004) (finding no prejudice from counsel's failure to object to that instruction where the State did not offer any admissions by Tejeda). In reviewing the same instruction considered in *Tejeda*, one member of our court opined: "This instruction dangerously infers that all statements, offered as uttered by the defendant, implies, or arguably directs, their truth. This impeaches, surely shakes, any contrary exculpatory evidence offered to rebut its content." *See Young v. State*, No. 06-0763, 2007 WL 3376830, at *5 (Iowa Ct. App. Nov. 15, 2007) (Schechtman, S.J., concurring). It appears the instruction was revised in 2003.

Payne's out-of-court admissions were to be given the same force and effect as if he had uttered the words from the witness stand under the penalty of perjury.[21] Because the court instructed the jury with an incorrect statement of law, we presume prejudice, unless the record affirmatively establishes no prejudice resulted. *Hanes*, 790 N.W.2d at 551. The State contends the jury was able to weigh all the evidence in the case. But I would find Payne's admissions were damaging enough that equating them to in-court testimony was not harmless.

Further, the implication of the flawed jury instruction—that Payne's out-of-court admission was to be given the same weight as sworn testimony—infringes on Payne's Fifth Amendment right against self-incrimination. Payne decided not to testify; the district court instructed the jury not to draw an inference of guilt from that decision. Yet the court also instructed the jury that Payne's earlier statements made outside of court could be considered as if they were his testimony. Other jurisdictions have held the mere fact that admitting statements by a party-opponent may motivate a defendant to take the stand to explain them does not mean he was compelled to do so in a manner implicating the privilege against self-incrimination. *See, e.g.*, *United States v. Holden*, 557 F.3d 698, 706 (6th Cir. 2009). But this case is different. Although Payne exercised his right not to testify, the court nevertheless instructed the jurors that they could consider his unsworn statements as a substitute for admissions made in open court. As a result, Payne was

---

[21] In other cases, trial courts have instructed juries by adding the "under oath" language to the uniform instruction regarding prior statements by the defendant. *See, e.g.*, *State v. Chinberg*, No. 16-1600, 2017 WL 6026718, at *2 (Iowa Ct. App. Nov. 22, 2017) (considering ineffective assistance claim for counsel's failure to object to this instruction, "You have heard evidence claiming Defendant made statements before this trial while not under oath. If you find such a statement was made, you may regard the statement as evidence in this case the same as if Defendant had made it under oath during the trial.").

effectively stripped of his right not to testify.  I would find submitting the challenged

jury instruction constituted reversible error.